Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
June 8, 2020

**2020 CO 51**

**No. 19SC251,** *Rocky Mountain Planned Parenthood, Inc. v. Wagner* — **Premises Liability Act — Predominant Cause — Duty.**

In this case arising from the 2015 mass shooting at a Planned Parenthood facility in Colorado Springs, the supreme court must decide two narrow questions. First, the court must determine whether the plaintiffs have introduced sufficient evidence to establish a genuine issue of material fact as to whether the shooter's conduct was the "predominant cause" of the plaintiffs' injuries such that the facility's conduct, even if it contributed to such injuries, could not be a substantial factor in causing them. Second, the court must address whether the plaintiffs have established a genuine issue of material fact as to whether the facility's parent organization owed them a duty of care.

As to the first question, the court concludes, without expressing any opinion on the merits of this case, that the plaintiffs have presented sufficient evidence to establish a genuine issue of material fact as to whether the shooter's conduct was the predominant cause of their injuries. Accordingly, the court concludes that the

division below correctly determined that summary judgment was inappropriate on this issue.

As to the second question, the court concludes, as a matter of law, that the plaintiffs did not establish that the facility's parent organization owed them a legal duty. Accordingly, the court concludes that the division correctly affirmed the entry of summary judgment for the parent organization on this claim.

The court therefore affirms the judgment of the division below.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

---

## 2020 CO 51

---

### Supreme Court Case No. 19SC251
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 17CA2304

---

### Petitioner/Cross-Respondent:

Rocky Mountain Planned Parenthood, Inc., a/k/a Planned Parenthood of the Rocky Mountains, Inc.,

and

### Cross-Respondent:

Planned Parenthood Federation of America, Inc.

v.

### Respondents/Cross-Petitioners:

Samantha Wagner; Ashley Stewart; A.S., a minor child acting through her mother and next best friend, Ashley Stewart; Mandy Davis; and Ammar Laskarwala.

---

### Judgment Affirmed
*en banc*
June 8, 2020

---

**Attorneys for Petitioner and Cross-Respondents:**
Taylor Anderson LLP
John M. Roche
Kevin S. Taylor
　　　*Denver, Colorado*

**Attorney for Respondents/Cross-Petitioners:**
McCormick & Murphy, P.C.
Kirk R. McCormick
*Colorado Springs, Colorado*

Law Offices of Joseph J. Archuleta and Associates, P.C.
Joseph Archuleta
*Denver, Colorado*

Wilcox Law Firm, LLC
Ronald L. Wilcox
*Denver, Colorado*

**Attorneys for Amicus Curiae American Tort Reform Association:**
Childs McCune LLC
Jordan Lipp
Margrit Lent Parker
*Denver, Colorado*

**Attorneys for Amicus Curiae Coloradans Protecting Patient Access:**
Caplan and Earnest LLC
Laura Wassmuth
*Boulder, Colorado*

**Attorneys for Amici Curiae Colorado Civil Justice League and Denver Metro Chamber of Commerce:**
Brownstein Hyatt Farber Schreck, LLP
Julian R. Ellis, Jr.
*Denver, Colorado*

**Attorneys for Amicus Curiae Colorado Defense Lawyers Association:**
Ruebel & Quillen, LLC
Jeffrey Clay Ruebel
*Westminster, Colorado*

**Attorneys for Amicus Curiae Colorado Trial Lawyers Association:**
Wilcox & Ogden, P.C.
Ralph Ogden
*Denver, Colorado*

Law One
James Anderson
*Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.
**JUSTICE HART** dissents in part, and **JUSTICE MÁRQUEZ** and **JUSTICE BOATRIGHT** join in the partial dissent.

¶1 This case arises from the 2015 mass shooting at Planned Parenthood of the Rocky Mountains' ("PPRM's") Colorado Springs facility, which left three people dead and nine seriously injured. Although the impact of this event on, and the importance of this case to, all of the parties now before us cannot be overstated, the questions that we must decide here are narrow. First, we must determine whether the plaintiffs have introduced sufficient evidence to establish a genuine issue of material fact as to whether Robert Dear's conduct as the shooter was the "predominant cause" of the plaintiffs' injuries such that PPRM's conduct, even if it contributed to such injuries, could not be a substantial factor in causing them. Second, we must address whether the plaintiffs have established a genuine issue of material fact as to whether PPRM's parent organization, Planned Parenthood Federation of America ("PPFA"), owed them a duty of care.[1]

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether an individual who acts to cause mass casualties and without regard to his own survival or capture is necessarily the predominant cause of harm to the victims of his attack, such that a landowner cannot be liable under the Colorado Premises Liability Act, section 13-21-115, C.R.S. (2019), for a failure to implement security measures that the Plaintiffs allege may have prevent[ed] the harm.

2. Whether the court of appeals erred in concluding that Planned Parenthood Federation of America, Inc. did not owe a duty of care to Rocky Mountain Planned Parenthood, Inc.'s invitees.

¶2    With respect to the first question before us, we conclude, without expressing any opinion on the merits of this case, that the plaintiffs have presented sufficient evidence to establish a genuine issue of material fact as to whether Dear's conduct was the predominant cause of their injuries. Accordingly, we conclude that the division below correctly determined that summary judgment was inappropriate on this issue.

¶3    With regard to the second question, we conclude, as a matter of law, that the plaintiffs did not establish that PPFA owed them a legal duty. Accordingly, we conclude that the division correctly affirmed the entry of summary judgment for PPFA on this claim.

¶4    We therefore affirm the judgment of the division below.

## I. Facts and Procedural History

¶5    During the summer of 2015, a group called the Center for Medical Progress, an anti-abortion organization, released a series of undercover videos purporting to show Planned Parenthood staff discussing methods of obtaining fetal organs and tissue for medical research and the financial compensation received

---

3. Whether the court of appeals erred in upholding the trial court's finding of fact based on support in the record for its finding rather than determining whether genuine issues of material fact exist.

5

therefrom. Soon after the release of these videos, which came to be known as the "baby body parts" videos, reproductive health facility staff members and state and local law enforcement officials reported a number of criminal or suspicious incidents targeting reproductive health facilities across the United States, including threats to blow up such facilities and threats of violence against individuals associated with them.

¶6 Dear apparently saw the above-described videos, and he determined to take action against PPRM because he was upset with that organization for performing abortions and "selling baby parts." Accordingly, on the morning of November 27, 2015, Dear went to the PPRM facility in Colorado Springs with eight guns of various sorts, propane tanks that he believed would explode if he shot at them, and a homemade ballistic vest. When Dear arrived at the PPRM facility, he began shooting people in its parking lot, killing one person and injuring two others. He then proceeded to enter the facility itself by shooting through the glass portion of the window to an entrance door. Once inside the building, Dear shot and killed another individual and injured several more before he engaged in a five-hour shootout with police who had arrived on the scene. In the course of this shootout, Dear killed one of the officers and wounded five other officers. By the end of Dear's rampage, he had killed three people and shot and injured approximately nine others. He then surrendered to the police.

6

¶7 The plaintiffs are several individuals who were injured during the shooting and the survivors of one of the victims who was killed. They ultimately filed suit against both PPRM and PPFA.

¶8 As pertinent here, the plaintiffs asserted a claim against PPRM under the Colorado Premises Liability Act, section 13-21-115, C.R.S. (2019) ("CPLA"). In this claim, they alleged that they were invitees at the Colorado Springs facility and therefore PPRM had a duty to provide them with a safe and secure environment, "free from foreseeable risks and dangerous conditions on the premises of which [PPRM] knew or should have known." The plaintiffs further alleged that Dear's attack was foreseeable, given the "long history of violent direct attacks, killings and threats" against Planned Parenthood facilities.

¶9 The plaintiffs also asserted a claim against PPFA for negligence. In this claim, the plaintiffs alleged that PPFA had a duty to exercise reasonable care to provide for the safety and security of the individuals it invited, through its chapters and affiliates, to come to its facilities. The plaintiffs contended, among other things, that PPFA had negligently supervised PPRM by (1) not regularly inspecting the operations and security at PPRM's Colorado Springs facility; (2) not developing and implementing detailed and thorough guidelines and policies concerning safety requirements at facilities that provided abortions; (3) not communicating or requiring such safety measures; (4) not requiring PPRM to

7

provide adequate warnings to the public; and (5) not properly instructing PPRM concerning proper security in light of the known threats.

¶10    Following discovery, both PPRM and PPFA filed motions for summary judgment. PPRM argued that it was entitled to summary judgment because, as a matter of law, it did not cause, nor should it have foreseen, the mass murderous assault committed by Dear. PPFA, in turn, argued that it was entitled to summary judgment because (1) the material facts belied a conclusion that it caused, or should have foreseen, Dear's mass murderous assault and (2) it owed no duty of care to the plaintiffs because it did not possess PPRM's Colorado Springs facility, it was not legally responsible for the conditions or activities conducted there, and it was not PPRM's alter ego.

¶11    The district court agreed with PPRM's assertion that, to the extent it had contributed to the plaintiffs' injuries, "Dear's actions predominate by orders of magnitude on the issue of causation." The district court further opined that Dear's actions were unforeseeable because, among other things, no violent crime of any kind had ever occurred at PPRM's Colorado Springs facility, nor did PPRM have notice that any kind of violence was imminent there, much less the kind of violence that ultimately ensued. The district court thus entered summary judgment in PPRM's favor.

¶12    The district court likewise agreed with PPFA's contention that, as a matter of law, it owed no duty to the plaintiffs.  In support of this ruling, the court concluded that the plaintiffs and PPFA were not in one of the recognized forms of "special relationships" that could give rise to a duty of care in a case like this.  In addition, the court concluded, based on the summary judgment record before it, that PPRM was, "incontrovertibly, not the alter ego of PPFA."  Thus, the district court granted summary judgment in favor of PPFA, as well.

¶13    The plaintiffs appealed and, in a published decision, a divided division of the court of appeals reversed the grant of summary judgment for PPRM but affirmed the judgment in PPFA's favor. *Wagner v. Planned Parenthood Fed'n of Am., Inc.*, 2019 COA 26, __ P.3d __.

¶14    With respect to PPFA, the division unanimously upheld the district court's conclusion that, as a matter of law, PPFA owed no duty to the plaintiffs and that, therefore, it was entitled to summary judgment.  *Id.* at ¶ 11; *see also id.* at ¶ 45 (Webb, J., concurring in part and dissenting in part).

¶15    With respect to PPRM, however, the division split.  *Id.* at ¶ 12; *see also id.* at ¶ 45 (Webb, J., concurring in part and dissenting in part).  The majority reversed the district court's order entering summary judgment for PPRM, agreeing with the plaintiffs that they had produced sufficient evidence to raise genuine issues of material fact as to whether PPRM (1) knew of reasonable security measures that

would have prevented harm to the plaintiffs and (2) was sufficiently aware of the potential for criminal conduct at its facilities such that it could have prepared for the type of offenses committed by Dear. *Id.* at ¶ 12. The majority thus concluded that a factual dispute existed as to whether PPRM knew or should have known of the danger faced by invitees who had entered or who were attempting to enter its facility on the day of the shootings. *Id.* at ¶ 19.

¶16 Judge Webb dissented from this portion of the division's opinion. *Id.* at ¶¶ 45–74 (Webb, J., concurring in part and dissenting in part). In Judge Webb's view, as a matter of law, a mass shooting involving the types of weapons and improvised bombs that Dear had employed "had such a predominant effect that it prevented PPRM's conduct from becoming a substantial factor" in causing the plaintiffs' injuries. *Id.* at ¶ 65. Because Judge Webb would have so ruled as to the issue of causation, he did not address the question of foreseeability, which he viewed as forming the basis for the majority's decision to reverse the summary judgment in PPRM's favor. *Id.* at ¶ 47.

¶17 PPRM petitioned for certiorari, and the plaintiffs cross-petitioned with regard to the grant of summary judgment in favor of PPFA. We granted both petitions.

## II. Analysis

¶18 We begin by setting forth the applicable legal standards governing our review of orders granting summary judgment. We then proceed to discuss the law applicable to the plaintiffs' claims against PPRM, and applying those principles here, we conclude that a genuine issue of material fact exists as to whether Dear was the predominant cause of the plaintiffs' injuries. Finally, we turn to the law applicable to the plaintiffs' claims against PPFA, and applying that law to the facts before us, we conclude, as a matter of law, that PPFA owed no duty to the plaintiffs.

### A. Applicable Legal Standard

¶19 We review an order granting summary judgment de novo. *Dep't of Revenue v. Agilent Techs., Inc.*, 2019 CO 41, ¶ 15, 441 P.3d 1012, 1016. Summary judgment is only proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." C.R.C.P. 56(c); *accord Agilent Techs., Inc.*, ¶ 15, 441 P.3d at 1016.

¶20 In considering whether summary judgment is appropriate, a court grants the nonmoving party the benefit of all favorable inferences that may reasonably be drawn from the undisputed facts and resolves all doubts against the moving

party. *Agilent Techs., Inc.*, ¶ 15, 441 P.3d at 1016. In responding to a properly supported summary judgment motion, however, the nonmoving party may not rest on mere allegations or demands in its pleadings but rather must provide specific facts demonstrating a genuine issue for trial. *Id.*

¶21 Summary judgment is a drastic remedy, and it should only be granted when it is clear that the applicable legal standards have been met. *Westin Operator, LLC v. Groh*, 2015 CO 25, ¶ 21, 347 P.3d 606, 611.

## B. Claims Against PPRM

¶22 PPRM asserts that there are no genuine issues of material fact in this case and that the district court therefore properly granted summary judgment in PPRM's favor. We are not persuaded.

¶23 The CPLA provides the basis for liability of a landowner when a person is injured while on the landowner's real property "by reason of the condition of such property, or activities conducted or circumstances existing on such property." § 13-21-115(2). In enacting the CPLA, the General Assembly sought "to clarify and to narrow private landowners' liability to persons entering their land, based upon whether the entrant is a trespasser, licensee, or invitee." *Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1219 (Colo. 2002). The statute's language thus "evidences the General Assembly's intent to establish a comprehensive and

exclusive specification of the duties landowners owe to those injured on their property." *Vigil v. Franklin*, 103 P.3d 322, 328 (Colo. 2004).

¶24 Whether an injured plaintiff should be classified as a trespasser, a licensee, or an invitee is a question of law to be decided by the court. *Id.* at 326. An "invitee" is "a person who enters or remains on the land of another to transact business in which the parties are mutually interested or who enters or remains on such land in response to the landowner's express or implied representation that the public is requested, expected, or intended to enter or remain." § 13-21-115(5)(a). The parties do not dispute that the plaintiffs (or those whose interests they represent) were invitees. Nor do the parties dispute that PPRM is a "landowner" under the CPLA. § 13-21-115(1) (defining "landowner" for purposes of the CPLA as including, without limitation, "an authorized agent or a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property").

¶25 Under the CPLA, subject to an exception not applicable here, "an invitee may recover for damages caused by the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known." § 13-21-115(3)(c)(I).

¶26 We do not appear to have considered whether the term "caused" within the meaning of the CPLA should be defined as it is in common law tort cases. The

parties here, however, have proceeded on the assumption that common law tort principles apply to define the term "caused" as that term is used in the CPLA, and we perceive no basis to proceed otherwise, particularly given that we see nothing in the text of the CPLA to suggest that the legislature intended a different meaning of that term (in contrast to the legislature's clearly expressed intent to circumscribe landowners' duties to those injured on their property). Accordingly, we will apply common law tort principles to construe the concept of causation here.

¶27 Although case law from this and other jurisdictions has occasionally used different terminology (and sometimes interchanged the applicable terminology), it appears well settled that to establish causation, a plaintiff must show, in substance, that the defendant's actions or inactions were both what we will call the "cause in fact" and the "legal" or "proximate cause" of the plaintiff's injury. *See* W. Page Keeton, Dan B. Dobbs, Robert E. Keeton & David G. Owen, *Prosser & Keeton on the Law of Torts* § 42, at 272–73 (5th ed. 1984) (noting that once it has been established that the defendant's conduct has in fact been one of the causes of the plaintiff's injury, there remains the question of whether the defendant should be legally responsible for that injury, and stating that "legal cause" or, perhaps, "responsible cause" would be a more appropriate term than what had often been referred to as "proximate cause"); *see also Build It & They Will Drink, Inc. v. Strauch*, 253 P.3d 302, 306 (Colo. 2011) (discussing proximate causation); *N. Colo. Med. Ctr.*,

14

*Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996) (quoting

with approval the discussion of causation in fact in *Smith v. State Comp. Ins. Fund*,

749 P.2d 462, 464 (Colo. App. 1987), but referring to that discussion as concerning

proximate causation); *Reigel v. SavaSeniorCare L.L.C.*, 292 P.3d 977, 985 (Colo. App.

2011) (quoting *N. Colo. Med. Ctr.*, 914 P.2d at 908, as reciting the test for causation

in fact and noting that legal causation is a separate aspect of the ultimate causation

inquiry).

¶28     With respect to what we would now term causation in fact, we have stated:

> The test for causation is the "but for" test—whether, but for the
> alleged negligence, the harm would not have occurred. The
> requirement of "but for" causation is satisfied if the negligent conduct
> in a "natural and continued sequence, unbroken by any efficient,
> intervening cause, produce[s] the result complained of, and without
> which the result would not have occurred."
>
> . . . .
>
> Also, for a plaintiff to prevail on causation, it is necessary to show that
> the negligence was a "substantial factor" in producing the harm.
>
> . . . .
>
> "Some other event which is a contributing factor in producing the
> harm may have such a predominant effect in bringing it about as to
> make the effect of the actor's negligence insignificant and, therefore,
> to prevent it from being a substantial factor. So too, although no one
> of the contributing factors may have such a predominant effect, their
> combined effect may, as it were, so dilute the effects of the actor's
> negligence as to prevent it from being a substantial factor."

*N. Colo. Med. Ctr.*, 914 P.2d at 908 (alteration in original; quoting *Smith*, 749 P.2d at 464); *see also Nowlan v. Cinemark Holdings, Inc.*, No. 12-CV-02517-RBJ-MEH, 2016 WL 4092468, at *2 (D. Colo. June 24, 2016) (noting that a plaintiff must prove that the alleged tortious conduct constitutes a "substantial factor" in producing the injury and that one factor may have such a predominant effect in causing the harm that it renders the effect of another factor insignificant and prevents it from being a substantial factor).

¶29 Causation in fact is typically a question for the jury, unless the undisputed facts would allow reasonable minds to draw just one inference from them. *See Kaiser Found. Health Plan of Colo. v. Sharp*, 741 P.2d 714, 719 (Colo. 1987); *Reigel*, 292 P.3d at 985–86.

¶30 "Legal" or what is sometimes called "proximate" causation, in turn, depends largely on the question of the foreseeability of harm. *See Strauch*, 253 P.3d at 306 (noting that "the concept of foreseeability is central to establishing proximate cause" and that foreseeability acts "as a guidepost to delineate the extent to which a defendant may be held legally responsible for a plaintiff's injury"). The existence of proximate or legal causation is also a question of fact for the jury at trial. *Id.*; *accord Westin Operator*, ¶ 33, n.5, 347 P.3d at 614 n.5.

¶31 The narrow question before us is whether PPRM has shown that, as a matter of law, Dear was the predominant cause of the plaintiffs' losses such that no

16

reasonable jury could reach a different conclusion. On the evidence in the summary judgment record before us, we cannot say that PPRM has met this difficult standard.

¶32    Here, the plaintiffs introduced substantial evidence showing that PPRM knew for many years that there was a risk of violence against its facilities. In fact, PPRM warned all new physicians that "there is an inherent risk associated with working [at PPRM]," and it provided them with training on how to protect themselves. PPRM even offered to provide all of these physicians with custom-fitted bulletproof vests, free of charge.

¶33    The plaintiffs also presented evidence tending to demonstrate that PPRM knew that the level of threats of violence and criminal activity directed against Planned Parenthood facilities increased exponentially in the aftermath of the release of the inflammatory "baby body parts" videos. In fact, after the videos were released, the Medical Director of PPRM personally reported the level of increased threats and more invasive actions to both the president and chief executive officer and the chief operating officer of PPRM, as well as to the president and chief executive officer of PPFA.

¶34    In addition to the foregoing, the plaintiffs presented evidence that, despite this awareness, PPRM did not take adequate precautions at the Colorado Springs facility. For example, the plaintiffs offered evidence to show that although PPRM

had hired an armed security guard, that guard was on duty only three days per week and only for about four hours each day (until 11:00 a.m. or 12:00 noon), despite the fact that the facility remained open (and doctors were performing abortions there) after the guard had ended his shift. Indeed, the guard had been at work on the day of the shooting but left at 11:00 a.m., shortly before Dear started his shooting rampage at approximately 11:35 a.m. Similarly, the plaintiffs offered evidence that PPRM did not erect a perimeter fence around the Colorado Springs facility, although it had done so at its Denver location, and it did not replace its tempered glass entry door with a steel or otherwise bullet-resistant door, which allowed Dear to shoot through the door to gain entry and continue his rampage.

¶35 Finally, the plaintiffs presented a lengthy and detailed affidavit from Lance Foster, an expert in premises security. In his affidavit, Mr. Foster opined, in pertinent part, that (1) the lack of security at the PPRM Colorado Springs facility made it a more likely target and placed it at a much higher risk for an event like that which ensued; (2) fencing would likely have prevented Dear from gaining entry onto the facility's property in the first place; (3) had the security guard been on duty, the shootings would likely have been prevented; and (4) had steel doors been installed and electronic lock down measures been employed, Dear would not likely have been able to enter the clinic itself. Based on the foregoing, Mr. Foster

18

opined that the shootings at issue "were reasonably preventable and the injurious effects could have been mitigated."

¶36 In light of this evidence, and cognizant of the settled principle that summary judgment is a drastic remedy, *see Westin Operator,* ¶ 21, 347 P.3d at 611, we conclude that on the evidence presented in the summary judgment record here, a reasonable juror could find that Dear was not the predominant cause of the plaintiffs' injuries and that therefore PPRM's action or inaction was a substantial factor in causing those injuries. Accordingly, we further conclude that PPRM was not entitled to the entry of summary judgment in this case.

¶37 In so concluding, we acknowledge but are not persuaded by the other mass shooting cases on which PPRM relies. In *Nowlan,* 2016 WL 4092468, at *3, a case arising out of the Aurora theater shooting, the court concluded that even if the theater owners' failure to provide certain security measures "contributed in some way to [plaintiffs'] injuries and deaths, . . . [the shooter's] premeditated and intentional actions were the predominant cause of plaintiffs' losses." The court thus determined that "a reasonable jury could not plausibly find that [the theater owners'] actions or inactions were a substantial factor in causing this tragedy" and therefore, "as a matter of law, defendants' conduct was not a proximate cause of plaintiffs' injuries." *Id.* Similarly, in *Castaldo v. Stone,* 192 F. Supp. 2d 1124, 1171 (D. Colo. 2001), a case arising out of the mass shooting at Columbine High School,

19

the court concluded that the perpetrators' actions "were the predominant, if not sole, cause of Plaintiffs' injuries. . . . As a matter of law, Plaintiffs have failed to allege that the individual School Defendants' conduct was a legal cause of Plaintiffs' injuries." And in *Lopez v. McDonald's Corp.*, 238 Cal. Rptr. 436, 445 (Cal. Ct. App. 1987), a case arising out of a mass shooting at a McDonald's restaurant, the court concluded that "the likelihood of this unprecedented murderous assault was so remote and unexpected that, as a matter of law, the general character of McDonald's nonfeasance did not facilitate its happening."

¶38 These cases involved random and extreme acts of violence committed, without warning or foreseeable motive. The present case, in contrast, involved a similar act of extreme violence, but this act was committed at a facility that had long been the subject of known threats of such violence, making the likelihood of an event like that which occurred less remote and arguably more foreseeable. Indeed, PPRM had taken some measures to protect against the known and escalating threats of violence at its facilities, although the plaintiffs introduced evidence to show that these measures were insufficient and that other reasonable measures could have prevented the plaintiffs' injuries and deaths. On these facts, we cannot preclude, as a matter of law, the possibility that a reasonable jury could find PPRM's allegedly insufficient security measures to have been a substantial factor in causing the plaintiffs' injuries, even given the magnitude of Dear's

20

premeditated efforts to cause mass casualties without regard for his own survival or capture.

¶39 We hasten to say that in ruling as we do, we offer no view as to the merits of the plaintiffs' claims. Nor should our opinion be read to suggest either (1) that different rules apply to what may be deemed "politically neutral" sites, on the one hand, and potentially "incendiary" sites such as a women's health clinic, on the other, or (2) that given the risk that a mass shooting could happen virtually anywhere, potential targets—even those that are sadly sometimes attractive to the deranged or sadistic, or those with sociopathic notions of political motivation— must build fortresses to protect against any possible risk. To the contrary, our ruling is limited to the specific facts of this case, based on the summary judgment record before us. And we do not intend to suggest that summary judgment is never appropriate in a case such as this, although we are likewise unwilling to say, as PPRM and some of its amici suggest, that summary judgment is required in virtually every case involving a mass shooting because the shooter's actions will almost always be the predominant cause of the victims' injuries. We say no more than that, on the summary judgment record here, we do not believe that a court can properly decide the predominant cause issue as a matter of law.

¶40 For these reasons, we conclude that the division correctly concluded that the district court erred in granting summary judgment in PPRM's favor here.

21

## C. Claims Against PPFA

¶41 On cross-petition, the plaintiffs contend that the division erred in concluding, as a matter of law, that PPFA owed no duty of care to PPRM's invitees. Again, we are not persuaded.

¶42 As an initial matter, we acknowledge the plaintiffs' assertion that the division applied the wrong legal standard in addressing PPFA's motion for summary judgment. In stating that the record supported the district court's finding that PPFA owed no duty to the plaintiffs, the division appeared to be reviewing the issue as if it were reviewing a factual finding (as opposed to a summary judgment ruling). *Wagner*, ¶ 11. To the extent that the division did so, we conclude that it erred. Nonetheless, as noted above, an appellate court reviews a grant of summary judgment de novo, and applying the correct standard, we conclude that the division reached the right result.

¶43 In *N.M. ex. rel. Lopez v. Trujillo*, 2017 CO 79, ¶ 25, 397 P.3d 370, 374, we explained that in deciding whether a defendant owed a duty of care to a plaintiff, we have recognized a distinction between claims based on a defendant's failure to act (i.e., nonfeasance) and claims based on a defendant's active misconduct (i.e., misfeasance). As pertinent here, we observed that in a nonfeasance case, the existence of a duty has been recognized primarily in cases involving a limited group of special relationships between the parties. *Id.* at ¶ 26, 397 P.3d at 374;

22

*accord Univ. of Denver v. Whitlock*, 744 P.2d 54, 58 (Colo. 1987). We noted that these types of relationships are "of such a character that social policy justifies the imposition of a duty to act." *N.M.*, ¶ 26, 397 P.3d at 374. We thus opined, "A duty to act might arise, for example, in a situation in which two parties are in a relationship of dependence or mutual dependence." *Id.*

¶44 To date, we have recognized only the following special relationships: (1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4) employer/employee; (5) parent/child; and (6) hospital/patient. *Id.* at ¶ 27, 397 P.3d at 374. Absent such a special relationship, we have generally declined to impose a duty of care in cases involving a defendant's nonfeasance. *Id.* at ¶ 28, 397 P.3d at 374.

¶45 Here, the plaintiffs assert, among other things, that as the national parent organization of PPRM, PPFA exercised extensive actual and apparent authority to control PPRM's activities, "including those security measures undertaken for the protection of third parties like the Invitees," and that such authority gave rise to a duty of care. The plaintiffs further argue that PPFA issued mandates requiring PPRM to abide by certain PPFA-imposed criteria for affiliation and that PPFA had the authority to revoke accreditation if PPRM failed to comply with such standards. And the plaintiffs contend that PPFA had established a national

security team to assist affiliates with security measures. According to the plaintiffs, each of these facts gave rise to a duty of care.

¶46 Notwithstanding the plaintiffs' assertion to the contrary, we construe the plaintiffs' allegations as assertions of nonfeasance, not misfeasance, because each of those allegations concern what PPFA allegedly did not do to ensure that PPRM followed PPFA's purported security mandates. Indeed, the plaintiffs' complaint makes this even more clear because, as noted above, the plaintiffs alleged that PPFA had negligently supervised PPRM by (1) not regularly inspecting the operations and security at PPRM's Colorado Springs facility; (2) not developing and implementing detailed and thorough guidelines and policies concerning safety requirements at facilities that provided abortions; (3) not communicating or requiring such safety measures; (4) not requiring PPRM to provide adequate warnings to the public; and (5) not properly instructing PPRM concerning proper security in light of the known threats. Allegations as to what a defendant did not do are indisputably allegations of nonfeasance. Accordingly, to defeat PPFA's summary judgment motion, the plaintiffs were required to produce sufficient evidence to establish a genuine issue of material fact as to whether PPFA was in a special relationship with the plaintiffs. We agree with the division that they have not done so.

24

¶47 As an initial matter, we note that it is unclear to us whether the plaintiffs are asserting a theory of liability based on an alleged principal-agent relationship between PPFA and PPRM. At times, the plaintiffs appear to suggest the existence of such a relationship, and they further seem to suggest that such a relationship shows that PPFA controlled PPRM's actions and, in turn, that PPFA therefore had a special relationship with the plaintiffs. The plaintiffs have not established either a special relationship between themselves and PPFA or PPFA's control over PPRM.

¶48 The plaintiffs assert that "PPRM's clinics would not have been authorized to operate as such without PPFA's blessing of their security programs," yet they presented no evidence to support such a contention. To the contrary, at best, the plaintiffs' evidence established no more than that PPFA provided "resources and recommendations" to its local affiliates, including resources and recommendations as to suggested security measures, as well as grants requested by affiliates to support their efforts to undertake security improvement projects. The evidence demonstrated, however, that the affiliates were not obligated to follow PPFA's recommendations.

¶49 PPFA's foregoing activities are readily distinguishable from the controlling entities' activities in *Grenier v. Commissioner of Transportation*, 51 A.3d 367 (Conn.

2012), and *Brown v. Delta Tau Delta*, 118 A.3d 789 (Me. 2015), on which the plaintiffs rely.

¶50    In *Grenier*, 51 A.3d at 373–74, the estate of a fraternity pledge sued the national fraternity, among others, after the pledge died in a car accident on the way back from a mandatory, fraternity-sponsored event. The estate argued, as pertinent here, that the national fraternity had exerted sufficient control over the local chapter such that it owed the pledge a duty of care. *Id.* at 376. The court ultimately concluded that the estate had presented sufficient evidence to create a genuine issue of material fact on this issue. *Id.* at 389. Specifically, the estate had introduced evidence to show that the national fraternity (1) financially supported the local chapter by owning and funding improvements to the local chapter's fraternity house; (2) promulgated regulations prohibiting the very activities that led to the pledge's death; and (3) "maintained supervisory authority over" the local chapter, including retaining the ability to review the chapter's policies and revoke its charter if it failed to follow the national fraternity's risk management policies. *Id.* at 389.

¶51    Likewise, in *Brown*, 118 A.3d at 790–91, the plaintiff was sexually assaulted at a fraternity party and sued the national fraternity, asserting a claim under Maine's premises liability law. The court ultimately concluded that the plaintiff had presented sufficient evidence to demonstrate that, as a matter of law, the

national fraternity had both the authority to control its local affiliates and actual control over them. *Id.* at 794. In support of this conclusion, the court noted that the national fraternity (1) provided the local chapter with an alumni adviser who was responsible for ensuring the chapter's compliance with the national organization's rules and guidelines; (2) had a "chapter consultant" visit each chapter at least once per semester to meet with the local leadership and alumni advisers and to report rule violations to the national fraternity, which would then investigate the infractions and sanction the chapter as necessary; and (3) required that *all* incidents of misconduct be reported to the national office and contemplated disciplinary measures, after affording due process rights to members charged with infractions. *Id.* at 794–95. Based on this evidence, the court concluded, "Through its comprehensive articles and clearly defined power structure, [the national fraternity] expressly reaches into the day-to-day affairs of its local chapters and creates a close, mutually beneficial relationship with its individual members." *Id.* at 795.

¶52 We perceive no similar evidence of such control by PPFA here. PPFA did not own PPRM's Colorado Springs facility. It did not impose extensive mandatory regulations akin to those that the national fraternities imposed on the local chapters in *Grenier* and *Brown*. It did not directly supervise or oversee PPRM's operations or facilities. And the evidence did not establish the same level of reach

27

into PPRM's day-to-day affairs that the national fraternities asserted in *Grenier* and *Brown*. To the contrary, in our view, this case presents facts more akin to those presented in *Whitlock*, 744 P.2d at 60–62.

¶53 In *Whitlock*, a student became a quadriplegic as a result of an accident on a trampoline that was located outside a fraternity house at the University of Denver. *Id.* at 55. The student sued the university for negligence, and a division of the court of appeals subsequently concluded that the university had owed the student a duty of care either to remove the trampoline from the fraternity's premises or to supervise its use. *Id.* at 56. We granted certiorari and reversed, concluding that, as a matter of law, the university did not owe such a duty. *Id.* at 62. In support of this determination, we observed that (1) the university did not generally attempt to impose regulations or restrictions on its students' private recreational pursuits and the students did not look to the university to ensure the safety of their recreational choices; (2) other than once advising the fraternity to remove the trampoline while it was not in use, the university never attempted to assert control over trampoline use by the fraternity members; and (3) although the university owned the fraternity house, had the right to inspect the building, and restricted the building's use by prohibiting students from using it for "unlawful or immoral conduct," the university's reservation of these limited rights was "generally not sufficient control to give rise to liability . . . for tort injuries." *Id.* at 60–62. As in

28

*Whitlock*, we conclude that the plaintiffs have presented no evidence to support a finding of sufficient control over PPRM to establish that PPFA owed them a duty of care here.

¶54 Finally, we are unpersuaded by the plaintiffs' apparent, but undeveloped, argument that PPFA, through its affirmative acts, undertook a duty to prevent the harm that the plaintiffs suffered in this case. To prove that PPFA assumed such a duty, the plaintiffs were required to show that PPFA voluntarily undertook to provide security to them and either (1) PPFA's failure to exercise reasonable care in performing this assumed duty increased the risk of harm to the plaintiffs or (2) the plaintiffs suffered harm because they relied on PPFA to provide that promised security. *See Jefferson Cty. Sch. Dist. R-1 v. Justus*, 725 P.2d 767, 770 (Colo. 1986); *DeCaire v. Pub. Serv. Co.*, 479 P.2d 964, 966–67 (Colo. 1971). The plaintiffs, however, have not presented any evidence that PPFA undertook any duty to them. Accordingly, they likewise did not establish that in exercising any assumed obligation, PPFA failed to exercise reasonable care or increased the risk of harm to them. And the plaintiffs have presented no evidence to support an allegation that they were relying on PPFA to provide security services to them at PPRM's Colorado Springs facility.

¶55  For these reasons, we conclude, as a matter of law, that PPFA did not owe the plaintiffs a duty of care and that therefore, the division correctly affirmed the district court's grant of summary judgment in PPFA's favor.

### III.  Conclusion

¶56  For the foregoing reasons, we conclude that the plaintiffs have presented sufficient evidence to create genuine issues of material fact as to whether Dear was the predominant cause of their injuries or whether PPRM's conduct or inaction was a substantial factor in causing those injuries.  Accordingly, without expressing any opinion on the merits of the plaintiffs' claims against PPRM, we conclude that the division correctly reversed the district court's grant of summary judgment in PPRM's favor.

¶57  We further conclude, however, that, as a matter of law, PPFA owed no duty to the plaintiffs.  Accordingly, the division correctly affirmed the district court's grant of summary judgment in PPFA's favor.

¶58  We therefore affirm the judgment of the division below and remand this case for further proceedings consistent with this opinion.

**JUSTICE HART** dissents in part, and **JUSTICE MÁRQUEZ** and **JUSTICE BOATRIGHT** join in the partial dissent.

30

JUSTICE HART, dissenting in part.

¶59 Colorado has had the unfortunate distinction of playing host to some of the most notorious mass shootings in our nation's history. In the wake of these shootings—including the 1999 Columbine High School massacre and the 2012 Aurora theater attack—questions arose as to whether, under the Colorado Premises Liability Act, section 13-21-115, C.R.S (2019) ("CPLA"), shooting victims could seek recovery from the owners of the real property on which the shootings were perpetrated. More specifically, these cases turned on the narrow question of whether a mass shooter's conduct was the "predominant cause" of the shooting victims' injuries such that the landowner's failure to implement certain security measures, even if it contributed to such injuries in a technical sense, could not be deemed a "substantial factor" in causing them. *See Castaldo v. Stone*, 192 F .Supp. 2d 1124, 1170–71 (D. Colo. 2001) (evaluating F.R.C.P. 12(b)(6) motion respecting the Columbine shooting); *Nowlan v. Cinemark Holdings, Inc.*, 2016 WL 4092468, at *2–3 (D. Colo. June 24, 2016) (discussing F.R.C.P. 56 motion regarding the Aurora shooting).

¶60 In this case, we attend to the aftermath of the 2015 attack on Rocky Mountain Planned Parenthood ("PPRM") committed by Robert Lewis Dear. And yet again, the question presented by this mass shooting case is a narrow one—did PPRM show that, "as a matter of law, Dear was the predominant cause of the plaintiffs'

1

losses such that no reasonable jury could reach a different conclusion"? Maj. op. ¶ 31. To this question, the majority today answers in the negative. In doing so, the majority begins by misstating settled Colorado law on causation. As a result, the majority makes "proximate cause" a determination solely of the foreseeability of a particular event—in this case a mass shooting—occurring at a particular location. The dangerous consequence of this move is to subject a landowner to liability for the irrational actions of a mass murderer, who has no concern about detection or death. And, while the majority asserts that its approach does not turn on the politically controversial nature of the landowner's business, I fear that in fact the majority is creating the equivalent of a heckler's veto—if a business owner receives threats of violence because of the nature of his business, the business owner will be subject to a risk of liability that could render his business uninsurable or require impossibly expensive fortifications.

¶61    Accordingly, I respectfully dissent in part.

## I. Applicable Law

¶62    I agree with the majority's conclusion that the CPLA incorporates common law tort principles of causation in providing that "an invitee may recover for damages *caused by* the landowner's unreasonable failure to exercise reasonable care to protect against dangers of which he actually knew or should have known." *Id.* at ¶ 26; *see also* § 13-21-115(3)(c)(I) (emphasis added).

¶63    I also agree that the causation analysis in Colorado consists of two prongs: (1) actual cause (or "but-for" causation), and (2) proximate cause (or "legal" causation).  Maj. op. ¶ 27.  But because I believe that the majority's elaboration of these two prongs is incorrect, I set out what I view as the correct analysis here.

¶64    Actual cause is evaluated according to the "but-for" test—"whether, but for the alleged negligence, the harm would not have occurred."  *N. Colo. Med. Ctr., Inc. v. Comm. on Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996) (quoting *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. App. 1987)).  By contrast, proximate cause requires a showing that the plaintiff's injuries were foreseeable and that the defendant's negligence "was a 'substantial factor' in producing the harm."  *Id.* (quoting *Smith*, 749 P.2d at 464).

¶65    The summary judgment action now before us turns on proximate cause—and specifically on whether the plaintiffs raised a genuine issue of material fact as to whether PPRM's alleged negligence was a "substantial factor" in producing the plaintiffs' shooting injuries.  In this context, the word "substantial" means

> that the defendant's conduct has such an effect in producing the harm as to lead [a] reasonable [person] to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.

Restatement (Second) of Torts § 431 cmt. a (Am. Law Inst. 1965). "[I]t is not enough that the harm would not have occurred had the actor not been negligent." *Id.*

¶66 Actual cause and proximate cause are effectively counterbalancing concepts. Engaging in "but-for" analysis by itself poses the risk of a defendant's exposure to virtually unlimited liability for otherwise remote or insubstantial circumstances. Almost anything existing in time and space is an actual cause—but for a defendant's grandmother's birth, for instance, the defendant's tortious conduct would never have happened. Proximate cause works in the exact opposite way—by asking whether the defendant's conduct was a "substantial factor" in the plaintiff's injuries, the law provides an intuitive "safety valve" relieving the defendant of liability even if his conduct (or his grandmother's birth, in the absurd case) is an actual cause of harm. *See, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) ("The term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." (emphasis removed)). Put differently, proximate cause is ultimately a question based in policy judgments and common sense: Given the circumstances, is it fair to hold the defendant responsible for the results of his conduct? And in this light, it becomes clear that proximate cause is a fundamentally liability-limiting

4

principle.[1]  Indeed, we have said that "Colorado's proximate cause rule is intended to ensure that casual and unsubstantial causes do not become actionable." *N. Colo. Med. Ctr.*, 914 P.2d at 908.

¶67    One means by which a defendant's conduct may be found insubstantial is if, in the case of multiple concurrent causes, one of the causes has "such a

[1] It bears mentioning that the CPLA itself is also liability limiting as compared to the common law it displaced.  When the General Assembly enacted the CPLA, it expressed a number of important policy purposes to be served by the CPLA. Relevant here, the legislature specified that one purpose of this newly codified legislative scheme was "to create a legal climate which will promote private property rights and commercial enterprise and will foster the availability and affordability of insurance."  § 13-21-115(1.5)(d).  Further, the legislature indicated that another purpose of the CPLA was "to protect landowners from liability in some circumstances when they were not protected at common law." § 13-21-115(1.5)(e); *see Pierson v. Black Canyon Aggregates, Inc.*, 48 P.3d 1215, 1219 (Colo. 2002) ("The overriding purpose of the premises liability statute is to clarify and to *narrow* private landowners' liability to persons entering their land . . . ." (emphasis added)); *see also Vigil v. Franklin*, 103 P.3d 322, 332 (Colo. 2004) (Kourlis, J., dissenting) ("The purpose of the modern premises liability statute is clear and unequivocal: namely, to promote private property rights and protect landowners from liability in some circumstances when they were not protected at common law.  A fortiori, the statute narrows the landowner's exposure to liability." (internal citations and quotations omitted)); John G. Salmon, *Fifteen Years of Colorado Legislative Tort Reform: Where Are We Now?*, Colo. Lawyer, Feb. 2001, at *5 (explaining the history of the CPLA as a response to the need to protect landowners from the high volume of personal injury claims and the problem that certain risks were becoming uninsurable).

predominant effect in bringing [the harm] about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor." *Smith*, 749 P.2d at 464 (quoting Restatement (Second) of Torts § 433 cmt. on clause (a) (Am. Law Inst. 1965)). Put another way, where "several events may have brought about the harm to [the] plaintiff, and an event other than the defendant's negligence appears predominant, the alleged negligence cannot be considered a substantial factor." *Hook v. Lakeside Park Co.*, 351 P.2d 261, 265 (Colo. 1960).

¶68 "While proximate cause is typically a question of fact reserved to the jury, the Court may conclude, as a matter of law, that such a predominant cause exists, and that there can be no other substantial factors." *Nowlan*, 2016 WL 4092468, at *2. And a finding that one cause was "predominant" precludes the defendant's alleged negligence from becoming the legal cause of the plaintiff's injury. *Smith*, 749 P.2d at 464.

## II. Analysis

¶69 The majority begins its legal analysis with a misstatement of the above legal standards. The majority describes *actual cause* as the locus of our requirement that a defendant's actions be a "substantial factor" in causing harm to a plaintiff. Maj. op. ¶ 28. Perhaps the majority intends to change Colorado law. If so, it should explain why. If not, then the majority incorrectly (or at least incompletely) states

6

that "'[l]egal' or what is sometimes called 'proximate' causation, in turn, depends largely on the question of the foreseeability of harm." *Id.* at ¶ 30. In fact, it is proximate cause that requires a showing that the defendant's negligence "was a 'substantial factor' in producing the harm." *N. Colo. Med. Ctr.*, 914 P.2d at 908 (quoting *Smith*, 749 P.2d at 464)*; see also Ekberg v. Greene*, 588 P.2d 375, 377 (Colo. 1978) ("Where the circumstances make it likely that defendant's negligence will result in injuries to others and where this negligence is a substantial factor in causing the injuries sustained, the requirement of proximate causation is satisfied.").

¶70 The majority's resulting focus almost exclusively on foreseeability leads to its analysis, which I believe is also incomplete and ultimately incorrect. Here, the majority insists that the plaintiffs in fact put forth sufficient evidence to create a genuine issue of material fact as to whether PPRM's actions were a substantial factor in the plaintiffs' injuries. But when we examine the evidence that the majority points to, it falls into two categories: evidence of foreseeability and evidence about negligence.

¶71 In the first category is evidence that tended to show that (1) PPRM had notice of the potential for violence and criminal activity directed against its facilities, and (2) PPRM knew that the threats of violence against it had worsened

dramatically after the release of the controversial "baby body parts" videos that ultimately motivated Dear to commit the shooting. Maj op. ¶¶ 32–33.

¶72 In the second category is a catalog of the precautions that PPRM could have taken, but did not take, as well as an expert opinion that, had PPRM taken some of these precautions, the harm caused by Dear's attack would have been mitigated or prevented. *Id.* at ¶¶ 34–35.

¶73 The majority's analysis misses the fact that, even assuming PPRM's failure to implement additional security measures on or around its facilities was negligent, such negligence "does not create liability on the part of a defendant unless that negligence is a proximate cause of the plaintiff's injury." *City of Aurora v. Loveless*, 639 P.2d 1061, 1063 (Colo. 1981). And by considering only evidence of foreseeability and evidence suggesting negligence, the majority has not completed the proximate cause analysis required when there are multiple potential causes of the complained-of harm.

¶74 The proximate cause analysis requires a consideration of whether the actions of PPRM, as a landowner, can be said to be a "substantial factor" in causing a mass shooting on its property. I would conclude that they cannot, and that, as every other court to consider the question under the CPLA has concluded, the premeditated and intentional actions of a mass shooter are the "predominant" cause of the injuries he inflicts such that any negligence on the part of a property

8

owner simply is not a "substantial factor" in causing those injuries. *See Nowlan*, 2016 WL 4092468, at \*3 (concluding that even if the Aurora theater owners' failure to provide certain security measures "contributed in some way to the [plaintiffs'] injuries and deaths, . . . [James Eagan Holmes's] premeditated and intentional actions were the predominant cause of plaintiffs' losses"); *Castaldo*, 192 F. Supp. 2d at 1171 (concluding that the actions of Dylan Klebold and Eric Harris at Columbine "were the predominant, if not sole, cause of Plaintiffs' injuries").

¶75 I would reach this conclusion because, as Judge Webb eloquently put it in his partial dissent, any "extra security measures pale in comparison to the conduct of actors bent on inflicting mass casualties who do not employ a rational cost/benefit calculus. And for this reason, weighing what security measures a landowner might adopt to protect against [mass shooters] is not bounded by reasonableness." *Wagner v. Planned Parenthood Fed'n of Am.*, 2019 COA 26, ¶ 68, __ P.3d __ (Webb, J., dissenting). This, it seems to me, is precisely the type of circumstance in which one cause of the plaintiffs' injuries—a mass shooter, not concerned about detection or death and intent upon causing as much damage as possible in the time he has—is the predominant cause such that any negligence by PPRM could not be a substantial factor in causing those injuries.

¶76 I believe we must acknowledge that the advent of the modern mass shooting like that committed at PPRM's facilities truly tests the boundaries of the proximate

cause inquiry (and, indeed, of premises liability law). On one hand, we expect all public-facing businesses — including women's health clinics — to incur the costs of security measures that are reasonably proportionate to the potential risk of harm to their patients. But, because mass shooters are not animated by reason or cost/benefit analysis, it is irrational to ask businesses — or jurors — to engage in the cost/benefit analysis of determining what sorts of preventative measures are sufficient to prevent or mitigate the harm caused by a shooter's senseless acts of violence.

¶77 I am also extremely troubled that, in concluding that summary judgment would be inappropriate, the majority distinguishes Dear's attack on PPRM's facilities from other mass shootings in Colorado's long history of such attacks because *this* mass shooting "was committed at a facility that had long been the subject of known threats of such violence," maj. op. at ¶ 38, meaning that the possibility of an attack like Dear's could have been foreseeable to PPRM.

¶78 I fully grant that "'the concept of foreseeability is central to establishing proximate cause' and that foreseeability acts 'as a guidepost to delineate the extent to which a defendant may be held legally responsible for a plaintiff's injury.'" *Id.* at ¶ 30 (quoting *Build It & They Will Drink, Inc. v. Strauch*, 253 P.3d 302, 306 (Colo. 2001)). And unfortunately, Planned Parenthood has suffered a "long history of violent direct attacks, killings and threats" against its various facilities. *Id.* at ¶ 8.

But the reason for such threats, largely unacknowledged by the majority, is the well-known fact that PPRM provides abortions—a service fraught with political controversy and heated cultural divide. While the majority asserts that its analysis does not turn on whether a mass shooter's attack is on a politically controversial business, I fear that the consequence of the court's approach is that certain businesses and activities will face entirely different risks of liability than others will.

¶79 It bears emphasizing that our proximate cause analysis has never, and should not now, turn on how controversial the goods or services offered by a landowner are. But the majority's approach creates a perverse incentive: Knowing that women's health clinics are more threat-prone than other public-facing businesses, and that such clinics may be found liable for their failure to mitigate or prevent mass shootings, abortion opponents can increase the frequency and severity of their threats of violence in order to force women's health clinics to fortify their facilities to extreme levels. This, in turn, makes women's health clinics both prohibitively expensive to operate and virtually impossible to insure. And in clearly specifying that its purposes in enacting the CPLA were to "promote private property rights," "foster the availability and affordability of insurance," and "protect landowners from liability" even more stringently than at common law, the legislature did not desire the potentially liability-expanding outcome the

11

majority now portends. § 13-21-115(1.5)(d), (e). Indeed, by shifting the risk posed by mass shooters to landowners and increasing the potential for liability, the majority's approach will have the opposite effect.

¶80 Moreover, this risk is not one that will be faced only by women's health clinics that provide abortion services. After today's decision, antisemitic fanatics can impose additional costs on synagogues, and White supremacists can inflict the same on Black churches or businesses. Threats of violence often precede acts of violence in these locations, as they did at PPRM.

¶81 I fear that the consequences of today's decision will be felt well beyond this litigation. The majority's analysis, by focusing so exclusively on foreseeability, significantly changes our proximate cause jurisprudence. In doing so, it ties the liability of the landowner to the nature of its business and ignores the reality that the overwhelming—the predominant—cause of harm to victims of mass shootings is the maniacal determination of the shooter himself.

¶82 For the foregoing reasons, with respect to the PPRM-specific issue in this case, I respectfully dissent.

I am authorized to state that JUSTICE MÁRQUEZ and JUSTICE BOATRIGHT join in this partial dissent.