1
 2026 CO 32 In Re Bella Boe, Chloe Coe, Danielle Doe, and Gabriella Goe, Plaintiffs v. Children's Hospital Colorado. Defendant No. 26SA66Supreme Court of Colorado, En BancMay 18, 2026
          
 Original Proceeding Pursuant to C.A.R. 21 District Court,
 City and County of Denver, Case No. 26CV30232 Honorable
 Ericka F. H. Englert, Judge
 
 
          
 Attorneys for Plaintiffs: Greisen Law, LLC Paula Greisen
 Denver, Colorado Demanding Equality, Inc. John M. McHugh
 Denver, Colorado
 
 
          
 Attorneys for Defendant: Garnett Powell Maximon Barlow
 &Farbes Stanley L. Garnett Leah M. Regan-Smith
 
 2
 
          Kristin
 L. Arthur Denver, Colorado Children's Hospital Colorado
 Patrick O'Rourke Aurora, Colorado
 
 
          
 Attorneys for Amici Curiae Denver Health and Hospital
 Authority and Colorado Hospital Association: Womble Bond
 Dickinson (US) LLP Kendra N. Beckwith Denver, Colorado
 
 
          
 JUSTICE HOOD delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE GABRIEL, JUSTICE BERKENKOTTER,
 and JUSTICE BLANCO joined.
 
 
          
 ORDER MADE ABSOLUTE
 
 
           HOOD
 JUSTICE
 
 3
 
          ¶1
 In this unusually fraught case-which directly and indirectly
 implicates efforts to limit the risk of harm to a wide
 variety of medically vulnerable children-we are asked
 essentially the following question: Did the trial court err
 by refusing to enter a preliminary injunction that would have
 required respondent, Children's Hospital Colorado
 ("CHC"), to repeal its recent suspension of medical
 gender-affirming care, when that repeal might invite the
 wrath of the federal government?[1]
 
 
          ¶2
 With sympathy for the petitioners, respondent's employees
 and representatives, and the trial court that had to blaze an
 uncertain trail, we conclude that the trial court erred in
 its application of the test we adopted in Rathke v.
 MacFarlane, 648 P.2d 648, 653-54 (Colo. 1982), for
 determining whether to grant a preliminary injunction.
 Therefore, we reverse the trial court's decision, and we
 order the court to issue a preliminary injunction directing
 CHC to restore its
 
 4
 
 offering of medically necessary medical gender-affirming
 care, pending a decision on the merits.
 
 
          I.
 Facts and Procedural History
 
 
          ¶3
 Petitioners are minor patients representing a class of
 similarly situated individuals who had been receiving
 gender-affirming care from CHC's TRUE Center for Gender
 Diversity ("TRUE Center"), a department created for
 the purpose of supporting gender-diverse and transgender
 patients.[2]
 
 
          ¶4
 CHC is the leading pediatric hospital in the Rocky Mountain
 Region, providing sometimes lifesaving medical care to a
 broad variety of ailing children from Colorado, Wyoming, New
 Mexico, Kansas, Montana, and other states.
 
 
          ¶5
 On December 18, 2025, the United States Secretary of Health
 and Human Services, Robert F. Kennedy, Jr., issued a
 declaration proclaiming that medical gender-affirming care is
 neither safe nor effective and "fail[s] to meet
 professional recognized standards of health care." U.S.
 Dep't of Health & Hum. Servs., Declaration of the
 Secretary of the Department of Health &Human Services RE:
 Safety, Effectiveness, and Professional Standards of Care for
 Sex-Rejecting Procedures on Children and Adolescents, at 9
 (Dec. 18, 2025) ("Kennedy Declaration"). The
 
 5
 
 Kennedy Declaration further warned that the federal
 Department of Health and Human Services ("HHS") may
 seek to exclude entities or individuals from federal health
 care payment programs if they provide medical
 gender-affirming care to minors. Id.
 
 
          ¶6
 CHC participates in federal health care payment programs and
 receives significant funding from the federal government. In
 2024, CHC received $182.6 million in funding, mostly from the
 federal government. Almost half of CHC's patients are
 Medicaid enrollees, and all commercial insurance companies
 require hospitals to participate in federal health care
 payment programs to qualify for contracts and to bill for
 services.[3] If CHC were excluded from federal health
 care payment programs, it wouldn't be able to treat any
 patients enrolled in Medicaid or serve patients who have
 commercial insurance.
 
 
          ¶7
 In response to the Kennedy Declaration, the Colorado Attorney
 General joined other state attorneys general in filing a
 lawsuit in federal court in Oregon, Oregon v.
 Kennedy, No. 6:25-cv-02409-MTK, at *2 (D. Or. Apr. 18,
 2026) (unpublished order) ("Oregon Order"),
 challenging the legality of the Declaration.
 
 
          ¶8
 Despite the pending lawsuit, HHS's general counsel
 announced on the social media platform X that he was
 referring CHC to the HHS Office of the
 
 6
 
 Inspector General ("OIG") for investigation for
 providing medical genderaffirming care in violation of the
 Kennedy Declaration. A few days later, OIG agreed not to
 exclude any entities until the Oregon court ruled on the
 then-pending motion for summary judgment or thirty days after
 the hearing on the motion for summary judgment, whichever was
 earlier.
 
 
          ¶9
 At the beginning of January 2026, CHC notified petitioners
 that it could no longer provide medical gender-affirming
 care-including hormone therapy and puberty blockers-to
 transgender patients under the age of eighteen. However, CHC
 continues to offer hormone therapy and puberty blockers to
 cisgender youth for various reasons.[4]
 
 
          ¶10
 Petitioners and other transgender youth who sought such care
 from CHC were suddenly abandoned during a precarious time.
 Without access to puberty blockers and hormone therapy, these
 children will go through puberty and develop characteristics
 of a sex with which they do not identify. Petitioners have
 experienced depression, and in at least two instances,
 suicidal ideation, because they can no longer access medical
 gender-affirming care.
 
 
          ¶11
 Petitioners filed a class action seeking an injunction to
 prevent CHC from refusing to provide medically necessary care
 to its transgender youth patients.
 
 7
 
 They argued that CHC's decision to stop providing
 gender-affirming care was discriminatory on the basis of
 gender identity, sex, and disability and thus violated the
 Colorado Anti-Discrimination Act ("CADA");
 specifically, section 24-34-601, C.R.S. (2025).[5] Regarding gender
 identity, petitioners assert they are being discriminated
 against because CHC is denying transgender youth access to
 puberty blockers and hormone therapy while continuing to
 provide the same medication to cisgender youth.
 
 
          ¶12
 The trial court denied petitioners' request for a
 preliminary injunction, concluding that they hadn't
 satisfied the six-factor test we adopted in Rathke for
 granting a preliminary injunction. Boe v. Child.'s
 Hosp. Colo., No. 26CV30232, at 22 (Dist. Ct., City
 & Cnty. of Denver, Feb. 13, 2026) (unpublished
 order). The trial court concluded that petitioners (1) were
 likely to succeed on the merits of their CADA claim; (2) had
 shown there was danger of real, immediate, and irreparable
 injury; and (3) had shown there was no plain, speedy, and
 adequate remedy at law. Id. at 18-20. Nevertheless,
 it denied petitioners' request for injunctive relief
 
 8
 
 because it found that (1) the injunction was contrary to the
 public interest; (2) the balance of the equities favored CHC;
 and (3) the injunction was not sufficiently specific to
 preserve the status quo pending a trial on the merits.
 Id. at 18-22.
 
 
          ¶13
 We granted petitioners' request for review under C.A.R.
 21.[6]
 
 
          II.
 Analysis
 
 
          ¶14
 We start by explaining our decision to exercise our original
 jurisdiction in this case and then discuss the applicable
 standard of review. Next, we provide an overview of the
 Rathke factors, which a moving party must satisfy
 for a trial court to grant a preliminary injunction. Finally,
 we address the disputed factors and review the trial
 court's application of those factors to the facts of this
 case.
 
 
          A.
 Original Jurisdiction
 
 
          ¶15
 Relief under C.A.R. 21 is an extraordinary remedy, and the
 decision to exercise original jurisdiction is a matter solely
 within our discretion. C.A.R. 21(a)(2); In re Marriage of
 Green, 2024 CO 24, ¶ 8, 547 P.3d 1095, 1097. Such
 relief may be granted only when no other adequate remedy is
 available. Edwards v. New Century Hospice, Inc.,
 2023 CO 49, ¶ 12, 535 P.3d 969, 972. We have exercised
 our
 
 9
 
 original jurisdiction when a petition also raises issues of
 first impression that are of significant public importance.
 Id.
 
 
          ¶16
 We exercise our jurisdiction here because an appellate remedy
 is inadequate: Petitioners will suffer irreparable harm
 without our intervention. The petition also raises important
 questions about how to apply certain preliminaryinjunction
 factors to anti-discrimination cases.
 
 
          B.
 Standard of Review
 
 
          ¶17
 We review a trial court's denial of a motion for a
 preliminary injunction for an abuse of discretion. Rathke,
 648 P.2d at 653. Under this standard, we examine whether the
 court's ruling is based on a misapplication or
 misinterpretation of the law, or is otherwise manifestly
 arbitrary, unreasonable, or unfair. People v. West,
 2025 CO 61, ¶ 13, 578 P.3d 832, 835; People v.
 Chavez, 2020 COA 80M, ¶ 8, 486 P.3d 377, 378. We
 review a trial court's findings of fact for clear error;
 meaning, we reverse only if there is no support for those
 findings in the record. Trinidad Area Health Ass'n v.
 Trinidad Ambulance Dist., 2024 COA 113, ¶ 22, 562
 P.3d 928, 933. We review a trial court's legal
 conclusions de novo. Evans v. Romer, 854 P.2d 1270,
 1275 (Colo. 1993).
 
 
          C.
 Preliminary Injunction
 
 
          ¶18
 To grant a party's motion for a preliminary injunction,
 the trial court must find that the moving party has
 demonstrated all six Rathke factors:
 
 10
 
 (1) a reasonable probability of success on the merits; (2) a
 danger of real, immediate, and irreparable injury which may
 be prevented by injunctive relief; (3) that there is no
 plain, speedy, and adequate remedy at law; (4) that the
 granting of a preliminary injunction will not disserve the
 public interest; (5) that the balance of equities favors the
 injunction; and (6) that the injunction will preserve the
 status quo pending a trial on the merits.
 
 
 648 P.2d at 653-54 (citations omitted).
 
 
          ¶19
 The parties don't dispute that petitioners have satisfied
 the second and third factors. Therefore, we focus our
 analysis on the remaining four factors, starting with those
 the court found lacking; namely, the fourth, fifth, and sixth
 because they form the basis for the petition.
 
 
          ¶20
 Then, we address CHC's challenge to the trial court's
 finding that petitioners satisfied the first factor: a
 reasonable probability of success on the merits. Although CHC
 has not petitioned this court for relief, and therefore the
 procedural posture of its challenge is unusual, we choose to
 address it now because it is so intertwined with the issues
 presented by petitioners.[7]
 
 
          1.
 Public Interest
 
 
          ¶21
 A court must ensure that, if issued, an injunction "will
 not disserve" the public interest. Id. at 654.
 Whether the trial court applied the appropriate test for
 
 11
 
 discerning the public interest in an anti-discrimination case
 is a question of law that we review de novo. See Evans, 854
 P.2d at 1275.
 
 
          ¶22
 In evaluating the public interest, courts may look to
 pronouncements by our state's elected representatives.
 See Colo. Mining Ass'n v. Bd. of Cnty.
 Comm'rs, 199 P.3d 718, 731 (Colo. 2009). We presume
 that their policy choices are made in the public's
 interest. See Kourlis v. Dist. Ct., 930 P.2d 1329,
 1336 (Colo. 1997).
 
 
          ¶23
 The Colorado General Assembly enacted CADA to
 "prohibit[] discrimination based on [identified]
 protected classes and [to] ensure[] that every Coloradan is
 able to enjoy freedom from discrimination." §
 24-34-300.7(1), C.R.S. (2025); see also Elder v.
 Williams, 2020 CO 88, ¶ 27, 477 P.3d 694, 699
 ("CADA claims derive from statutory duties designed to
 implement the broad policy of eliminating intentional
 discriminatory or unfair employment practices, rather than to
 compensate an individual for personal injuries.").
 
 
          ¶24
 CADA states that
 
 
 [i]t is a discriminatory practice and unlawful for a person,
 directly or indirectly, to refuse, withhold from, or deny to
 an individual or a group, because of disability, . . . sex, .
 . . [or] gender identity. . . the full and equal enjoyment of
 the goods, services, facilities, privileges, advantages, or
 accommodations of a place of public accommodation ....
 
 
 § 24-34-601(2)(a).
 
 
          ¶25
 The General Assembly has also specifically identified a
 public interest in protecting Colorado citizens who seek
 medical gender-affirming care by
 
 12
 
 declaring, "It is the public policy of Colorado to
 ensure [that decisions related to gender-affirming health
 care services] can be made without unnecessary governmental
 interference." § 24-34-300.7(2).
 
 
          ¶26
 Beyond CADA, the General Assembly has repeatedly declared
 that gender identity is a protected class. See §
 1-47-107, C.R.S. (2025) (voting rights); § 5-3-210,
 C.R.S. (2025) (extension of consumer credit); §
 6-23-104, C.R.S. (2025) (primary health care providers);
 § 6-24-110, C.R.S. (2025) (cemeteries); § 8-5-101,
 C.R.S. (2025) (wage equality); § 10-3-1104.9, C.R.S.
 (2025) (deceptive insurance practices); § 12-245-202,
 C.R.S. (2025) (regulation of mental health care); §
 13-93-102, C.R.S. (2025) (attorney licensing); §
 18-1-714, C.R.S. (2025) (victims' rights); §
 19-1-130, C.R.S. (2025) (foster care); § 19-2.5-1502.5,
 C.R.S. (2025) (juvenile justice system); § 22-1-142.5,
 C.R.S. (2025) (public school graduation ceremonies); §
 23-1-137.7, C.R.S. (2025) (higher education graduation
 ceremonies); § 24-18-307, C.R.S. (2025) (law enforcement
 facial recognition service); § 24-34-502, C.R.S. (2025)
 (housing); § 24-34-701, C.R.S. (2025) (advertising);
 § 24-90-122, C.R.S. (2025) (public libraries); §
 25-2-110, C.R.S. (2025) (death certificates); §
 25-2-113.8, C.R.S. (2025) (birth certificates); §
 25.5-5-329, C.R.S. (2025) (family planning services); §
 26.5-1-116, C.R.S. (2025) (preschool graduation ceremonies);
 § 28-5-103, C.R.S. (2025) (veteran affairs).
 
 13
 
          ¶27
 Thus, it's hardly surprising that the trial court
 recognized that granting the requested injunctive relief
 would serve the public interest by protecting petitioners and
 other vulnerable transgender and gender-diverse youth. Boe,
 at 20. Colorado law makes it unmistakably so.
 
 
          ¶28
 But the trial court still found itself in a bind. It worried
 that ordering CHC to "violat[e] . . . federal law,"
 as it put it, could have catastrophic consequences for a
 larger segment of the public. Id. at 21 &n.2. It
 reasoned that issuing an injunction would disserve the public
 interest because it could prompt HHS to exclude CHC from
 federal health care payment programs, which could force CHC
 to shut down. Id. at 20. And if CHC were to shut
 down, it would lose the ability to provide any pediatric care
 to thousands of patients throughout the Rocky Mountain
 Region. Id. Thus, the court found that "the
 requested injunction could create a greater risk to a greater
 number of individuals, which would adversely affect the
 public interest." Id. at 21.
 
 
          ¶29
 In reaching this conclusion, the trial court relied on
 Trinidad, an opinion from a division of our court of appeals.
 Id. at 17. In Trinidad, a different trial court
 denied a motion for an injunction that would have compelled
 an ambulance district to perform inter-facility transfers
 even when that would leave no crew available to immediately
 respond to incoming 911 calls. ¶¶ 43-44, 562 P.3d
 at 936. The division affirmed the trial court's decision
 because granting the preliminary
 
 14
 
 injunction "could 'create a greater risk to a
 greater number of individuals.'" Id.
 Trinidad, however, did not involve a protected class. The
 case before us does.
 
 
          ¶30
 We conclude that a Trinidad-style strict numerical comparison
 of affected individuals isn't appropriate when the
 individuals seeking injunctive relief are part of a protected
 class and seeking an injunction because of discrimination
 based on that protected class. Were it otherwise, minority
 groups would always lose. But that is not the law. On the
 contrary, that's precisely why we have protected classes.
 Cf. United States v. Carolene Prods. Co., 304 U.S.
 144, 152 n.4 (1938) (suggesting more protection is required
 when there is prejudice against discrete and insular
 minorities).[8]
 
 
          ¶31
 The trial court's concern about opposing the public
 interest by ordering CHC to "violat[e] . . . federal
 law" is also misplaced. Why? Because the Kennedy
 Declaration isn't federal law. See Regular Route Common
 Carrier Conf. of Colo. Motor Carriers Ass'n v. Pub.
 Utils. Comm'n, 761 P.2d 737, 748-49 (Colo. 1988)
 (distinguishing general statements of policy that don't
 carry the force of law from
 
 15
 
 substantive rules, which must go through formal rulemaking
 and therefore do carry the force of law); see also
 Burroughs Wellcome Co. v. Schweiker, 649 F.2d 221,
 224 (4th Cir. 1981). A declaration from the HHS secretary can
 be a basis for exclusion from federal health care payment
 programs, but the Declaration itself isn't a federal law
 banning gender-affirming care. See 42 U.S.C. §
 1320a-7(b)(6)(B) (authorizing HHS to exclude an entity from
 federal health care payment programs if the secretary
 determines that the quality of care the entity is providing
 fails to meet professionally recognized standards of health
 care); Kennedy Declaration, supra, at 9 ("This
 declaration does not constitute a determination that any
 individual or entity should be excluded from participation in
 any Federal health care program. Any such determination could
 only be made after a separate determination under 42 C.F.R.
 § 1001.701 ....").
 
 
          ¶32
 Furthermore, since the trial court issued its order here, the
 federal district court in Oregon has issued its opinion,
 concluding that the Kennedy Declaration is unlawful and
 enjoining HHS from initiating enforcement actions based, in
 whole or in part, on the Kennedy Declaration. Oregon Order,
 supra, at *2.
 
 
          ¶33
 Because any potential harm to the public's interest in
 access to health care is speculative, and because the General
 Assembly has stated that it is in the public's interest
 to prohibit discrimination against individuals based on
 gender identity
 
 16
 
 and to protect those individuals' access to medical care,
 we conclude that the trial court erred by finding that
 petitioners failed to satisfy the public-interest factor.
 
 
          2.
 Balance of the Equities
 
 
          ¶34
 The balance-of-the-equities factor allows a trial court to
 consider "whether the threatened injury to the plaintiff
 outweighs the threatened harm the preliminary injunction may
 inflict on the defendant." Rathke, 648 P.2d at 654.
 Unlike the public-interest factor, which looks at the impact
 on the broader public, this factor focuses on balancing the
 harms (or lack thereof) to the parties in the case. This
 factor militates in favor of granting an injunction if the
 alleged harm to the nonmoving party is too speculative and
 the moving party has demonstrated actual harm. RoDa
 Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir.
 2009) (requiring more than "speculation" to show
 that potential harm to the defendant outweighed actual injury
 to the plaintiff); see also, e.g., Am. Invs. Life Ins.
 Co. v. Green Shield Plan, Inc., 358 P.2d 473, 475-76
 (Colo. 1960) (explaining that a court shouldn't issue an
 injunction if the harm to the moving party is too
 speculative).
 
 
          ¶35
 Petitioners, the moving party, have demonstrated that they
 face actual and continuing physical and psychological harm if
 the preliminary injunction isn't issued. Without access
 to medical gender-affirming care, petitioners are likely to
 experience irreversible physical changes to their bodies that
 are inconsistent with their gender identity. Puberty blockers
 are a type of medical gender-affirming care
 
 17
 
 that use hormones to delay the natural onset of puberty. Boe,
 at 4. Doctors may prescribe puberty blockers to allow minor
 patients more time to consider their gender identity.
 Id. Going through puberty causes physical changes
 that are difficult, if not impossible, to reverse without
 surgery. Id. When puberty blockers are stopped,
 puberty proceeds in accordance with biology. Id.
 
 
          ¶36
 This harm to petitioners is real and actively occurring.
 Petitioner Gabriella Goe[9], a nine-year-old who started living as
 a girl by her fourth birthday and has been a patient at the
 TRUE Center since the age of six, was expecting to start
 using puberty blockers in March or April 2026 to allow her
 more time to decide whether to go through testosterone-led
 puberty. Gabriella's mother testified at the injunction
 hearing that if Gabriella can't get puberty blockers
 before puberty begins, she will be devastated.
 
 
          ¶37
 The denial of care has already caused at least one of the
 petitioners to suffer grave psychological harm. Petitioner
 Danielle Doe was diagnosed with gender dysphoria at a young
 age, and her family decided to move from Texas to Colorado so
 they could live in a state with more protections for
 transgender people. Danielle started puberty blockers when
 she was twelve years old, and she has been
 
 18
 
 receiving other medical gender-affirming care from the TRUE
 Center. After learning that CHC could no longer provide her
 care, Danielle was hospitalized at CHC for a depressive
 episode. She wrote her mother a letter that expressed
 suicidal ideation, stating, "If I don't see you
 again, I love you."
 
 
          ¶38
 The nonmoving party, CHC, has also demonstrated significant
 potential harm if the court issues the preliminary injunction
 and HHS follows through on its threat to exclude CHC from
 federal health care payment programs. However, the threat of
 harm to CHC remains speculative, and CHC has other avenues to
 address it. Issuing the preliminary injunction petitioners
 seek won't cause CHC's immediate exclusion from
 federal health care payment programs or cause it to shut
 down. See generally 42 C.F.R. § 402.212.
 
 
          ¶39
 Before HHS may lawfully exclude CHC from federal health care
 payment programs, it must follow administrative procedures,
 which include providing proper notice to CHC and giving CHC
 an opportunity to respond. Id. If HHS determines
 that exclusion is warranted, CHC may request a hearing before
 an administrative law judge to determine whether "[t]he
 basis for the imposition of the sanction exists." 42
 C.F.R. § 1001.2007(a)(1)(i). The Oregon Order declared
 the Kennedy Declaration unlawful, Oregon Order, supra, at *2;
 therefore, presently, the Kennedy Declaration may not be used
 as a basis to exclude entities from federal health care
 payment programs. True, HHS may appeal the Oregon Order
 
 19
 
 or devise a new way to exclude entities that provide medical
 gender-affirming care, but even if this were to occur,
 opportunities for further judicial review exist.
 
 
          ¶40
 Critically, if HHS seeks exclusion, CHC may be able to obtain
 judicial review of the agency's action without first
 exhausting administrative remedies. See 42 U.S.C. §
 1320a-7(f)(1) (incorporating 42 U.S.C. § 405(g) to
 authorize judicial review of actions of the secretary of
 HHS). The United States Supreme Court has recently reaffirmed
 federal courts' ability to waive exhaustion requirements
 for equitable and practical reasons, particularly when
 exhaustion would be inefficient, or in the words of the
 Court, "pointless, wasteful, or too slow."
 Santos-Zacaria v. Garland, 598 U.S. 411, 418 (2023);
 see also Smith v. Berryhill, 587 U.S. 471, 478
 (2019) (clarifying that the "element of administrative
 exhaustion" in 42 U.S.C. § 405(g)-the exhaustion
 requirement that applies to HHS exclusion procedures-may be
 "excused by the courts"). And the Tenth Circuit has
 recognized an exception to the exhaustion requirement in 42
 U.S.C. § 405(g) if exhaustion would be futile,
 irreparable harm would result, and a colorable constitutional
 claim that is collateral to the substantive claim of
 entitlement is raised. Koerpel v. Heckler, 797 F.2d
 858, 862 (10th Cir. 1986) (citing Mathews v.
 Eldridge, 424 U.S. 319, 328 (1976)).
 
 
          ¶41
 Here, CHC can assert that the exception should apply because
 administrative law judges don't have the authority to
 enjoin an act of the secretary,
 
 20
 
 42 C.F.R. § 1005.4(c)(4), and there is no process to
 stay CHC's exclusion during the appeals process. Thus,
 the administrative appeals process in this scenario would be
 futile.
 
 
          ¶42
 Moreover, CHC could argue that because the exclusion would
 begin twenty days after the notice of exclusion and because
 exclusion would cut CHC off from a major funding source and
 force it to close, it would suffer irreparable harm if it
 were forced to exhaust administrative remedies. Given the
 grave consequences of exclusion, CHC can raise a colorable
 due process claim based on the inadequacy of HHS's
 exclusion procedures. Therefore, if HHS seeks exclusion, CHC
 may seek immediate judicial review. Once in federal court,
 CHC can request a preliminary injunction to stop the
 exclusion while the court reviews the merits of the case. 5
 U.S.C. § 705.
 
 
          ¶43
 To further demonstrate the threat of harm it faces, CHC also
 highlights the Department of Justice's ("DOJ")
 efforts to subpoena medical records of patients who have
 received gender-affirming care and personnel records of the
 medical professionals who provided such care as an example of
 the unrelenting nature of this administration's efforts
 to attack providers of gender-affirming care. The DOJ is
 investigating providers of medical gender-affirming care to
 youth and the United States District Court for the Northern
 District of Texas recently granted the DOJ's petition to
 enforce a subpoena for such medical and personnel records
 
 21
 
 against Rhode Island Hospital. In re Admin. Subpoena
 25-1431-032, No. 4:26-mc-00006-O (N.D. Tex. Apr. 30, 2026)
 (unpublished order). CHC is in ongoing litigation in the
 United States District Court for the District of Colorado to
 quash a similar subpoena the DOJ issued to it. In re
 Dep't of Just. Admin. Subpoena No. 25-1431-030, No.
 25-mc-00063-SKC-CYC (D. Colo. filed Aug. 8, 2025). But CHC is
 in a different procedural posture than Rhode Island Hospital,
 so the order from the United States District Court for the
 Northern District of Texas doesn't guarantee a specific
 outcome in CHC's case. While we understand the
 seriousness and likelihood that HHS will follow through on
 the threatened action, at this point and before this court,
 those threats remain speculative.
 
 
          ¶44
 Therefore, given all of the contingencies in play and the
 various opportunities CHC has to avoid exclusion, we conclude
 that the actual immediate and irreparable harm to petitioners
 outweighs the speculative harm CHC may face if the federal
 government further acts against it. The trial court erred in
 concluding that the balance of the equities didn't favor
 petitioners.[10]
 
 22
 
          3.
 Preserving the Status Quo
 
 
          ¶45
 The purpose of an injunction is to preserve the status quo
 and to protect the rights of the parties pending a final
 decision on the merits. Anderson v. Pursell, 244
 P.3d 1188, 1196 (Colo. 2010). The status quo is the last
 uncontested status between the parties before the dispute
 developed. Dominion Video Satellite, Inc. v. EchoStar
 Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001).
 When the implementation of a new rule is involved, the
 appropriate status quo is "the status quo before the
 rule was enacted." Sanger v. Dennis, 148 P.3d
 404, 419 (Colo.App. 2006). To maintain the status quo,
 "injunction[s] prohibiting conduct must be sufficiently
 precise to enable the party subject to the [injunction] to
 conform its conduct to the requirements." Colo.
 Springs Bd. of Realtors, Inc. v. State, 780 P.2d 494,
 499 (Colo. 1989).
 
 
          ¶46
 Here, before the dispute arose-that is, before CHC suspended
 providing medical gender-affirming care to transgender
 youth-doctors and other medical personnel at CHC provided
 medical gender-affirming care to youth patients when they
 deemed it medically necessary to do so. Thus, the status quo
 that the injunction would preserve is CHC's pre-January
 2026 policy of providing medically necessary medical
 gender-affirming care to transgender patients under the age
 of eighteen.
 
 23
 
          ¶47
 Petitioners are simply asking CHC to revert to the level of
 care it offered before CHC's suspension of care in
 response to the Kennedy Declaration, not to provide new
 services. They are asking CHC to allow providers to give
 medical gender-affirming care to transgender youth if the
 provider deems such care necessary; they are not asking CHC
 to force providers to provide such care. CHC can't force
 providers to prescribe gender-affirming care to individual
 patients, but it can define the scope of services it offers.
 Because CHC offered medical genderaffirming care until
 January 2026, the requested injunction simply preserves that
 status pending resolution of the merits of this dispute.
 
 
          ¶48
 The trial court also found that the terms of the proposed
 injunction weren't sufficiently specific. It reasoned
 that CHC wouldn't be able to conform its conduct to the
 injunction because the injunction doesn't define the term
 "medically necessary care" or explain what care
 must be provided and when CHC must provide it. We disagree.
 
 
          ¶49
 The term "medically necessary" is a term of art
 grounded in established standards used by medical experts,
 and it has been used by courts to grant injunctions in the
 past. E.g., Edmo v. Corizon, Inc., 935 F.3d 757, 803
 (9th Cir. 2019). So, "Medically necessary care"
 isn't a vague term to CHC in this context because the
 trial court found that the TRUE Center prescribed medical
 gender-affirming care only when it was medically necessary
 for the treatment of gender dysphoria.
 
 24
 
 Boe, at 3. We therefore conclude that the proposed
 preliminary injunction is specific enough to notify CHC of
 what is expected of it and would preserve the status quo.
 See People ex rel. Rein v. Meagher, 2020 CO 56,
 ¶ 44, 465 P.3d 554, 563 (concluding that an injunction
 was sufficiently specific when the defendant was required to
 cease violating an agency rule). Accordingly, the trial court
 erred by concluding that petitioners failed to satisfy this
 factor.
 
 
          4.
 Success on the Merits
 
 
          ¶50
 Having addressed the factors placed at issue in the petition,
 we pivot back to CHC's challenge to the trial court's
 finding as to the first factor: the reasonable probability of
 success on the merits. To determine whether this factor is
 satisfied, a trial court is "obliged to assess the
 proper legal standard and applicable burden of proof which
 would be required at a subsequent trial on the merits."
 Rathke, 648 P.2d at 655. This requires a court to
 "substantively evaluate the issues as it would during
 trial." Dallman v. Ritter, 225 P.3d 610, 621
 (Colo. 2010). As opposed to a permanent injunction, to obtain
 a preliminary injunction, petitioners need only show a
 "likelihood of success on the merits rather than actual
 success." Id.
 
 
          ¶51
 CHC challenges the trial court's conclusion that
 petitioners demonstrated a reasonable probability of success
 on the merits of their CADA claim. The trial court determined
 that petitioners "have demonstrated a probability that
 they will succeed on the merits of their claims under CADA
 because the testimony and
 
 25
 
 evidence at the preliminary injunction hearing tended to
 demonstrate that CHC has ceased offering medical gender
 affirming care at least in part due to [petitioners']
 gender identity and/or disability." Boe, at 19. We
 afford the trial court deference and conclude that the record
 supports the trial court's finding. See Trinidad, ¶
 22, 562 P.3d at 933.
 
 
          ¶52
 To succeed on their CADA claim, petitioners must prove that
 CHC is a place of public accommodation and that it denied
 petitioners full and equal enjoyment of goods, services,
 facilities, privileges, advantages, or accommodations because
 of their sex, gender identity, or disability. See §
 24-34-601(2)(a). Hospitals are a place of public
 accommodation. § 24-34-600.3(1)(a)(VII).
 
 
          ¶53
 Petitioners must prove causation-"that, 'but
 for' their membership in an enumerated class, they would
 not have been denied the full privileges of a place of public
 accommodation." Craig v. Masterpiece Cakeshop,
 Inc., 2015 COA 115, ¶ 28, 370 P.3d 272, 280,
 rev'd on other grounds sub nom., Masterpiece
 Cakeshop, Ltd. v. Colo. C.R. Comm'n, 584 U.S. 617
 (2018). Petitioners, however, don't have to prove
 "that their membership in the enumerated class was the
 'sole' cause of the denial of services," just
 that "the discriminatory action was based in whole or in
 part on their membership in the protected class."
 Id. Nor do petitioners have to prove animus.
 Id. at ¶ 37, 370 P.3d at 282.
 
 26
 
          ¶54
 The trial court considered the testimony and evidence
 presented at the preliminary injunction hearing to determine
 that CHC differentiated between transgender and cisgender
 patients. Boe, at 18. There is no dispute that CHC ceased
 offering puberty blockers and hormone therapy to transgender
 patients under the age of eighteen while continuing to offer
 puberty blockers and hormone therapy to cisgender patients
 under the age of eighteen.[11] Puberty blockers and hormone
 therapy for both transgender and cisgender patients serve the
 purpose of timing and aligning puberty with gender identity.
 For cisgender patients, the medication helps time and align
 puberty with that of the gender they identify with, which is
 consistent with their gender assigned at birth. And for
 transgender patients, the medication helps time and align
 puberty with that of the gender they identify with, which
 differs from their gender assigned at birth. Denying access
 to puberty blockers and hormone therapy for the purpose of
 gender-affirming care but not for purposes unrelated to
 gender-affirming care differentiates care based on gender
 identity.
 
 27
 
          ¶55
 Even without analyzing the disparate treatment between
 transgender and cisgender youth, CHC's policy to suspend
 providing medical gender-affirming care explicitly
 discriminates against patients because of their gender
 identity. Gender-affirming care is inextricably intertwined
 with gender identity. In Craig, the division held that action
 related to same-sex marriage implicates sexual orientation.
 ¶ 39, 370 P.3d at 282. Similarly, here, action related
 to genderaffirming care implicates gender identity.
 
 
          ¶56
 Furthermore, CHC has directly tied its decision to suspend
 medical genderaffirming care to the identity of transgender
 patients. In its letter notifying patients' families that
 it was suspending care, CHC stated, "We continue to
 believe that all families, including the families of
 transgender children, should have the ability to seek and
 receive the expert medical care their child needs to
 thrive." And in a previous letter to patients'
 families, in response to a federal executive order that
 attempted to ban gender-affirming care for patients under
 nineteen years of age, CHC stated that the ban "denies
 the families of gender diverse children the same rights as
 other families." CHC's decision to suspend medical
 genderaffirming care to youth denies petitioners the full and
 equal enjoyment of services based on gender identity.
 
 
          ¶57
 The trial court also found that petitioners demonstrated
 causation under CADA because "but for"
 petitioners' membership in a protected class-gender
 
 28
 
 identity-they wouldn't have been denied access to care.
 Boe, at 13, 18. CHC argues that "the contributing factor
 producing the harm of which [petitioners] complain is that
 the federal government has used 'every means possible to
 stop gender affirming care and has interfered with care in a
 way that is unprecedented.'" And, CHC asserts,
 "[t]hat factor breaks any other causal chain."
 See Rocky Mountain Planned Parenthood, Inc. v.
 Wagner, 2020 CO 51, ¶ 28, 467 P.3d 287, 292
 (stating that, in a negligence claim, an intervening cause
 can break the chain of causation and dilute an actor's
 negligence). CHC argued to the trial court that it had a
 legitimate, nondiscriminatory reason for its decision to
 suspend medical gender-affirming care: the existential threat
 posed by the Kennedy Declaration.
 
 
          ¶58
 Petitioners argue CHC can't avoid responsibility by
 claiming it's merely implementing a third-party's
 discriminatory agenda. See Williams v. Dep't of Pub.
 Safety, 2015 COA 180, ¶ 47, 369 P.3d 760, 771
 (identifying a theory that holds a party liable for
 discriminatory conduct when another "who lacked
 decisionmaking power used the formal decisionmaker as a dupe
 in a deliberate scheme to bring about" discriminatory
 conduct). Although CHC acted reluctantly and expressed no
 animus toward transgender patients, the action it chose to
 take in response to the Kennedy Declaration specifically
 targeted transgender youth
 
 29
 
 patients. The Kennedy Declaration may have influenced
 CHC's decision, but it doesn't absolve CHC of
 responsibility.
 
 
          ¶59
 The trial court concluded the testimony and evidence
 presented at the preliminary injunction tended to demonstrate
 that CHC's denial of medical gender-affirming care to
 petitioners was, at least in part, because of
 petitioners' status, which is enough to satisfy causation
 for a claim under CADA. Boe, at 19; see Craig, ¶ 28, 370
 P.3d at 280; see also Bostock v. Clayton Cnty., 590
 U.S. 644, 656 (2020) (explaining that under Title VII-a
 federal anti-discrimination statute similar to CADA-a
 defendant can't avoid liability by citing another factor
 that contributed to the discriminatory decision). We agree
 with the trial court. CHC's decision to suspend offering
 medical gender-affirming care to transgender patients under
 the age of eighteen, in response to the Kennedy Declaration,
 denied petitioners care because of their gender identity.
 
 
          ¶60
 For these reasons, we conclude that the trial court
 didn't err by finding that petitioners had demonstrated
 that there is a reasonable probability of success on the
 merits of their CADA claim.
 
 
          III.
 Conclusion
 
 
          ¶61
 Because petitioners satisfied all six Rathke factors, the
 trial court abused its discretion by denying petitioners'
 motion for a preliminary injunction. We make the order to
 show cause absolute, reverse the trial court's order, and
 remand the
 
 30
 
 case to the trial court to grant petitioners' motion and
 issue the requested injunction.
 
 31
 
          
 JUSTICE BOATRIGHT, joined by JUSTICE SAMOUR, dissented.
 
 
          ¶62
 Faced with the risk of losing hundreds of millions of dollars
 in federal funding, which would threaten the viability of its
 entire hospital system, Children's Hospital Colorado
 ("CHC") made a considered decision to suspend
 medical gender-affirming care that it had previously provided
 to minors.[1] As the majority acknowledges, this is a
 difficult and fraught situation. I cannot begin to imagine
 the complicated conversations CHC's administration had
 because of the impact that its decision would have. While I
 have no doubt that the results of CHC's decision have
 been painful, it is my view that CHC's actions did not
 constitute discrimination under the Colorado
 Anti-Discrimination Act ("CADA"). Hence, I
 respectfully dissent. Under the first factor enumerated in
 Rathke v. MacFarlane, 648 P.2d 648, 653 (Colo.
 1982), petitioners' claims are unlikely to succeed on the
 merits, and the requested injunction should therefore be
 denied.[2]
 
 32
 
          I.
 Facts and Procedural History[3]
 
 
          ¶63
 CHC has been providing medical gender-affirming care to
 transgender youth through its TRUE Center for Gender
 Diversity, established in 2007. On December 18, 2025, the
 U.S. Department of Health and Human Services issued what is
 known as the "Kennedy Declaration," concluding that
 "[s]ex-rejecting procedures for children and adolescents
 are neither safe nor effective as a treatment modality for
 gender dysphoria" and thus authorizing the Office of the
 Inspector General ("OIG") to exclude providers who
 offer medical genderaffirming care to minors from
 participating in federal health care programs. U.S. Dep't
 of Health &Hum. Servs., Declaration of the Secretary of
 the Department of Health &Human Services RE: Safety,
 Effectiveness, and Professional Standards of Care for
 SexRejecting Procedures on Children and Adolescents, at 9
 (Dec. 18, 2025). Less than two weeks later, on December 30,
 2025, CHC was referred to OIG for violating the Kennedy
 Declaration by continuing to provide this care to minors.
 
 
          ¶64
 In direct response to its referral to OIG, on January 5,
 2026, CHC advised patients that it was immediately suspending
 its provision of medical genderaffirming care to minors,
 fearing exclusion from federal health care programs-which CHC
 reports would halt federal reimbursements and threaten
 
 33
 
 the hospital's license, accreditation, and participation
 in commercial health insurance plans.
 
 
          ¶65
 Four transgender minor patients at CHC, who had been
 receiving medical gender-affirming care for gender dysphoria,
 brought claims against CHC under CADA, section
 24-34-601(2)(a), C.R.S. (2025), alleging discrimination in a
 place of public accommodation on the basis of gender
 identity, sex, and disability. Petitioners sought a
 preliminary injunction ordering CHC to continue providing
 "medically necessary care."
 
 
          ¶66
 A preliminary injunction is "an extraordinary
 remedy." Rathke, 648 P.2d at 651. To be entitled to
 preliminary injunctive relief, a moving party must
 demonstrate each of the following six factors: (1) "a
 reasonable probability of success on the merits"; (2)
 "a danger of real, immediate, and irreparable injury
 which may be prevented by injunctive relief"; (3) the
 absence of a "plain, speedy, and adequate remedy at
 law"; (4) that "a preliminary injunction will not
 disserve the public interest"; (5) that "the
 balance of equities favors the injunction"; and (6) that
 "the injunction will preserve the status quo pending a
 trial on the merits." Id. at 653-54. If even
 one factor is unsatisfied, then the request for a preliminary
 injunction should be denied. Id. at 654.
 
 
          ¶67
 After a hearing, the trial court denied the preliminary
 injunction, in part based on the fourth and fifth
 Rathke factors: The court determined that obligating
 
 34
 
 CHC to provide this care "could place CHC at a greater
 risk of exclusion" and thus "would pose a grave
 danger to the public interest"-greater than that to
 petitioners.
 
 
          ¶68
 The trial court did, however, find that petitioners
 demonstrated a reasonable probability of success on the
 merits of their CADA claims, satisfying the first Rathke
 factor. It explained that because CHC "continues to
 offer hormone therapy and puberty blockers to cisgender youth
 for purposes not related to gender affirming care[,]
 [r]efusing to offer these treatments to transgender patients
 for the purpose of gender affirming care facially
 differentiates between transgender and cisgender
 patients." Accordingly, the court found that the record
 "tended to demonstrate that CHC has ceased offering
 medical gender affirming care at least in part due to
 [petitioners'] gender identity." Along the same
 lines, the court found that petitioners demonstrated a
 sufficient likelihood of success on their CADA claims that
 CHC discriminated on the basis of disability given its
 finding that gender dysphoria can cause disability.
 
 
          ¶69
 Petitioners then petitioned for a rule to show cause under
 C.A.R. 21, challenging the trial court's denial of the
 preliminary injunction.
 
 
          II.
 Analysis
 
 
          ¶70
 In my view, petitioners' CADA claims do not make it past
 the first Rathke factor-likelihood of success on the
 merits-because petitioners failed to
 
 35
 
 demonstrate with reasonable probability that CHC's
 decision to discontinue gender-affirming care to minors
 constituted discrimination under CADA. See 648 P.2d at 653.
 
 
          ¶71
 Section 24-34-601(2)(a) of CADA requires discrimination to be
 because of a petitioner's protected status. Specifically,
 CADA provides:
 
 
 It is a discriminatory practice and unlawful for a person,
 directly or indirectly, to refuse, withhold from, or deny to
 an individual or a group, because of disability . . . sex . .
 . [or] gender identity . . . the full and equal enjoyment of
 the goods, services, facilities, privileges, advantages, or
 accommodations of a place of public accommodation ....
 
 
 Id. (emphasis added).[4]
 
 
          ¶72
 The majority seems to accept without question that CHC's
 decision to suspend medical gender-affirming care to minors
 constituted discrimination, largely adopting the trial
 court's findings that the evidence "tended to
 demonstrate that CHC's denial of medical gender-affirming
 care to petitioners was, at least in part, because of
 petitioners' status" and understanding this as
 "enough to satisfy causation for a claim under
 CADA." Maj. op. ¶ 59.
 
 
          ¶73
 But, from my perspective, CHC's decision to terminate
 gender-affirming care for minors was plainly not
 "because of" petitioners' gender identity, sex,
 or
 
 36
 
 disability. This decision was made only after CHC was
 threatened with exclusion from federal health care programs,
 which again, would halt all federal reimbursements and
 threaten the hospital's license, accreditation, and
 participation in commercial insurance plans. It was a
 decision driven by the direct threat to the viability of the
 entire hospital. The majority barely acknowledges the true
 cause of the decision by tepidly saying that the Kennedy
 Declaration "may have influenced CHC's
 decision." Id. at ¶ 58. That completely
 minimizes the reality of the situation. Furthermore, it
 brushes off these drastic consequences as speculative.
 Id. at ¶ 33. But based on the record before us,
 I cannot fathom that CHC would have made this call if the
 consequences of the Kennedy Declaration were not so severe.
 The Kennedy Declaration, not any individual's or
 group's gender identity, sex, or disability, was the
 reason CHC decided to stop providing medical gender-affirming
 care. Petitioners' protected status played no role in its
 decision.
 
 
          A. The
 Majority's Definition of "Service" Did Not
 Consider How Gender-Affirming Care Is Fundamentally Different
 
 
          ¶74
 Respectfully, the core of my disagreement is the manner in
 which the majority chooses to treat two entirely different
 medical services as the same thing in their abbreviated
 analysis of Rathke's first factor, regarding
 petitioners' probability of success on their CADA claim.
 Maj. op. ¶¶ 50-60.
 
 37
 
          ¶75
 This dispute by and large focuses on the continued
 administration of puberty blockers to treat precocious
 puberty, but not to treat gender dysphoria. The majority
 concludes that because certain puberty blockers are still
 provided to youth diagnosed with conditions like precocious
 puberty, a hormonal condition that causes the early onset of
 puberty, denying these medications for youth diagnosed with
 gender dysphoria is discriminatory because both treatments
 "serve the purpose of timing and aligning puberty with
 gender identity." Maj. op. ¶ 54. The only
 difference the majority notes is that for cisgender patients,
 this gender identity is consistent with the gender assigned
 at birth, and for transgender patients, this gender identity
 differs from the gender assigned at birth. Id. The
 majority's argument depends on defining the
 "service" at issue here in broad terms, grouping
 any and all hormone therapy into one bucket. Id.
 
 
          ¶76
 In contrast, CHC frames medical gender-affirming care as a
 different kind of medical service than treating precocious
 puberty. Thus, it points out that, by declining to provide
 medical gender-affirming care (such as hormone replacement
 therapy or puberty blockers for gender dysphoria), it is
 simply declining to include this service in its "scope
 of care." CHC argues that "nothing within CADA
 requires a hospital to treat every medical condition or offer
 every treatment program."
 
 38
 
          ¶77
 While treatment for gender dysphoria and hormonal conditions
 like precocious puberty can both consist of puberty blockers,
 this does not make these treatments one and the same, such
 that providing one service but not the other constitutes
 discrimination under CADA. A medical service should not be
 defined based on the medication prescribed; rather, a medical
 service is defined by "the underlying medical concern
 the treatment is intended to address." United States
 v. Skrmetti, 605 U.S. 495, 513 (2025) (addressing
 whether Tennessee's ban on medical gender-affirming care
 for minors violated the Equal Protection Clause of the
 Fourteenth Amendment to the U.S. Constitution). In my view,
 the majority conflates the medication provided with the
 condition treated, regardless of the reason why it is needed
 or prescribed. This is problematic. For example, using
 prednisone, a corticosteroid, to treat eczema is not the same
 as using it to treat back pain-it is the same medication but
 two different treatments. So, it is troubling that the
 majority concludes that CHC's decision to offer one
 treatment but not the other is, in and of itself,
 discrimination. It isn't that simple.
 
 
          ¶78
 As acknowledged by the parties themselves, and as
 demonstrated by the record, precocious puberty and gender
 dysphoria are completely different conditions, leading to
 distinct considerations for care. Precocious puberty is a
 physical condition causing the early onset of puberty, before
 the age of eight or nine, that can result in complications
 like stunted growth. Precocious puberty, Mayo
 
 39
 
 Clinic (July 25, 2025),
 https://www.mayoclinic.org/diseases-conditions/
 precocious-puberty/symptoms-causes/syc-20351811
 [https://perma.cc/5CSF-4TBU]. In such cases, puberty blockers
 are used to temporarily prevent the onset of puberty to avoid
 such complications. Id.
 
 
          ¶79
 On the other hand, gender dysphoria, as defined by the trial
 court, is a condition that causes a person "extreme
 distress due to the difference between gender identity and
 the gender or sex assigned at birth." It has a far wider
 array of treatment options, including certain pharmaceutical
 and surgical interventions.[5]As the trial court found,
 depending on the unique needs of a child, treatment may
 include puberty blockers, meant to "temporarily pause
 sexual development" and allow patients "time to
 explore their identity."
 
 
          ¶80
 Precocious puberty and gender dysphoria are different
 conditions. Thus, the use of puberty blockers to treat
 precocious puberty and their use to treat gender dysphoria
 are different medical services. To lump them into a singular
 bucket is illogical and ultimately untenable. Therefore, it
 is inaccurate to characterize CHC's decision to stop
 providing puberty blockers as a treatment for
 
 40
 
 gender dysphoria while continuing to provide this medication
 for precocious puberty as discrimination.
 
 
          ¶81
 Using this correct framing of medical "service,"
 petitioners' gender identity, sex, or disability was not
 a "but-for" cause of CHC's decision to cease
 medical gender-affirming care for minors. "But-for"
 causation instructs courts to change one thing at a time to
 see if the outcome changes. Bostock v. Clayton
 Cnty., 590 U.S. 644, 656 (2020). If it does, we have
 found a but-for cause. Id. So here, the causal
 question becomes: Do the services CHC provides to its
 patients change depending on their protected status? The
 answer is a resounding no. Medical gender-affirming care for
 minors, as a treatment for gender dysphoria, is not offered,
 while other hormonal treatments, like puberty blockers for
 precocious puberty, are offered to all patients who need it.
 Therefore, CHC raises a valid point when it argues that
 petitioners may have "allege[d] a valid CADA claim if
 [CHC] denied transgender patients puberty blockers for
 precocious puberty." (Emphasis added.) They
 didn't.[6]
 
 
          ¶82
 The majority cites CHC's statement that it
 "believe[s] that all families, including the families of
 transgender children, should have the ability to seek and
 
 41
 
 receive the expert medical care their child needs to
 thrive" as indicating that CHC "has directly tied
 its decision to suspend medical gender-affirming care to the
 identity of transgender patients." Maj. op. ¶ 56.
 But, in my view, that attribution is ill-considered; instead,
 that comment merely emphasizes that CHC had compassion for
 the petitioners and that it wanted to provide that care.
 
 
          B.
 Petitioners Failed to Establish any Evidence of
 Discriminatory Intent
 
 
          ¶83
 Even accepting the majority's construction of the medical
 service at issue here, petitioners' CADA claims fail on
 intent, which the majority leaves largely unaddressed.
 
 
          ¶84
 Petitioners argued at the preliminary injunction hearing that
 the phrase "because of" only requires a court to
 review "but-for" causation and that it is
 "irrelevant whether or not the hospital's decision
 is based on animus," citing Craig v. Masterpiece
 Cakeshop, Inc., 2015 COA 115, ¶ 37, 370 P.3d 272,
 282 ("CADA requires no such showing of
 'animus.'" (citing Tesmer v. Colo. High Sch.
 Activities Ass'n, 140 P.3d 249, 253 (Colo.App.
 2006))), rev'd on other grounds sub nom., Masterpiece
 Cakeshop, Ltd. v. Colo. C.R. Comm'n, 584 U.S. 617
 (2018). However, I view this as an incomplete
 characterization of CADA.
 
 
          ¶85
 First and foremost, petitioners' (and the trial
 court's) reliance on Craig is misplaced. In Craig, the
 division's statement that "CADA requires no such
 showing of 'animus'" was made to distinguish
 that case from Bray v. Alexandria
 
 42
 
 Women's Health Clinic, 506 U.S. 263 (1993), which
 concerned an action under 42 U.S.C. § 1985(3).
 Craig, ¶¶ 36-37, 370 P.3d at 281-82.
 Neither does section 1985(3) expressly require intent, but in
 Bray, the Supreme Court applied precedent
 interpreting section 1985(3) as requiring plaintiffs to prove
 that defendant's actions were motivated by "some . .
 . class-based, invidiously discriminatory animus." 506
 U.S. at 268 (quoting Griffin v. Breckenridge, 403
 U.S. 88, 102 (1971)). Thus, in assessing whether CADA
 requires a similar showing of intent, Craig took the
 absence of similar precedent interpreting CADA's language
 to conclude that it does not.[7]
 
 
          ¶86
 The majority glosses over CHC's intent in ceasing this
 particular kind of medical treatment. This is concerning. If,
 for instance, CHC had decided to cease medical
 gender-affirming care because it lacked the expertise to
 safely continue offering this service, the majority's
 rationale would still deem that action discriminatory. Maj.
 op. ¶ 59 (agreeing with the trial court that
 "CHC's denial of medical gender-affirming care to
 petitioners was, at least in part, because of
 
 43
 
 petitioners' status, which is enough to satisfy causation
 for a claim under CADA"). That would be an absurd
 result.
 
 
          ¶87
 Common sense dictates that one cannot discriminate against
 another without a motive or purpose to do so, at least in
 this context. The petitioners, however, failed to present any
 evidence of discriminatory intent. That's not
 surprising-there was no discriminatory intent. CHC has made
 it very clear that its decision to stop the provision of
 medical gender-affirming care to minors does not come from a
 place of animus, disdain, or disapproval of transgender
 individuals seeking these kinds of services. In fact, the
 very opposite is true. First, CHC continues to provide
 medical gender-affirming care to transgender adults,
 unmistakenly signaling that it is not declining to provide
 this care because of petitioners' gender identity.
 Second, CHC had been providing medical genderaffirming care
 to transgender youth for years, stopping this care only after
 they were referred to OIG for failure to comply with the
 Kennedy Declaration. Instead, the record demonstrates that
 CHC made this decision for its own survival, as well as the
 thousands of patients who would be deprived of all medical
 care if the hospital were to meet its demise.[8]
 
 44
 
          ¶88
 Nor am I persuaded by petitioners' warning that CHC is
 "merely implementing a third-party's discriminatory
 agenda" and that not considering this as discrimination
 would "create a heckler's veto where bigots could
 threaten places of public accommodation" and entities
 like CHC "could use those threats to justify denying
 services to minorities." These situations are not one
 and the same. Exclusion from federal programs is not mere
 financial pressure. If the federal authorities proceed as
 they have repeatedly promised with a regulatory sanction
 under 42 C.F.R. § 1001, CHC will not only "be
 excluded from participation in Medicare, Medicaid and all
 other Federal health care programs," 42 C.F.R. §
 1001.1(a), but, as found by the trial court, it consequently
 may lose accreditation by the Colorado Department of Public
 Health and Environment, eligibility to participate in
 commercial health insurance, and the ability to staff faculty
 from the University of Colorado School of Medicine. The
 bottom line is that the Kennedy Declaration is a government
 directive that threatens CHC with catastrophic consequences
 if it fails to comply.
 
 
          ¶89
 The decision to offer a specific form of medical care is
 specialized and technical. It involves complexities and
 medical considerations that this court
 
 45
 
 neither has expertise in nor been provided with enough
 information to meaningfully assess: whether a hospital has
 the resources or expertise to provide adequate care; whether
 there are sufficient patients who need the treatment to make
 it financially or logistically viable; and, most importantly,
 whether a hospital will have resources if it decides to
 continue providing this care. These are decisions that a
 hospital is best equipped to make in the absence of a showing
 that such decisions were "because of"
 petitioners' gender identity, sex, or disability under
 CADA.
 
 
          C. This
 Case Is Distinguishable from Those Discussing
 "Inextricable Intertwinement" of Conduct and Status
 
 
          ¶90
 Admittedly, this issue is complicated by the fact that the
 medical condition at issue is experienced only by those in
 the protected class. Because only the transgender population
 seeks out medical gender-affirming care for gender dysphoria,
 declining to provide this service exclusively impacts this
 population.
 
 
          ¶91
 Petitioners thus suggest that CHC's termination of
 medical genderaffirming care for transgender minors
 constitutes discrimination because "[d]rawing
 distinctions based on characteristics 'inextricably
 intertwined' with transgender status or a gender
 dysphoria diagnosis is discrimination on the basis of
 transgender status or disability." They again quote
 Craig to argue that "[j]ust like a 'tax on wearing
 yarmulkes is a tax on Jews,'" ¶ 39, 370 P.3d at
 282 (quoting
 
 46
 
 Bray, 506 U.S. at 270), "so too is a ban on gender
 affirming care for 'transgender youth' discrimination
 on the basis of gender identity." That analogy is
 misplaced. ¶92 In Craig, Masterpiece Cakeshop argued
 that it refused to bake a cake for the plaintiffs not
 "because of" their sexual orientation, but because
 it disagreed with plaintiffs' plans to enter into a
 same-sex marriage. ¶ 30, 370 P.3d at 280. The division
 found this distinction inappropriate, given that the U.S.
 Supreme Court has rejected distinctions between
 "discrimination based on a person's status and
 discrimination based on conduct closely correlated with that
 status." Id. at ¶ 32, 370 P.3d at 280
 (citing Christian Legal Soc'y Chapter of Univ. of
 Cal., Hastings Coll. of Law v. Martinez, 561 U.S. 661,
 689 (2010), in which the Supreme Court noted its
 "decisions have declined to distinguish between status
 and conduct" in response to Christian Legal
 Society's argument that it did not exclude individuals
 because of sexual orientation, but because of their
 engagement in "unrepentant homosexual conduct," id.
 at 672, 689).
 
 
          ¶93
 This case is distinguishable, however. This case would be
 comparable to Craig only if it was demonstrated that CHC is
 refusing to offer medical genderaffirming care because it
 does not agree with the decisions by petitioners-all
 transgender individuals (status)-to seek medical
 gender-affirming care (conduct). As already addressed, CHC is
 not discriminating because of the petitioners' protected
 status or conduct.
 
 47
 
          ¶94
 Relatedly, both parties' briefing compared gender
 dysphoria to sickle-cell anemia, a condition affecting almost
 exclusively people of African descent. U.S.Ctrs. for Disease
 Control &Prevention, Data and Statistics on Sickle Cell
 Disease, (May 15, 2024),
 https://www.cdc.gov/sickle-cell/data/index.html [https://
 perma.cc/2MET-9JFT]. CHC asserts that it would not be
 discriminating against Black people if it declined to treat
 sickle-cell anemia because it did not have the appropriate
 stem-cell treatment available. I agree.
 
 
          ¶95
 Petitioners respond with a different hypothetical. Suppose,
 they offer, that a hospital refused to treat HIV or AIDS
 because it refused to treat homosexual men. They suggest
 that, if we determine CHC did not engage in discrimination
 here, this hypothetical provider would likewise be immune
 from CADA liability for refusing to treat HIV or AIDS even if
 it explicitly ties its decision to sexual orientation
 discrimination.
 
 
          ¶96
 These hypotheticals actually highlight the validity of my
 position on intent. In the sickle-cell anemia hypothetical,
 declining to offer stem-cell treatment for sickle-cell anemia
 patients would not be discriminatory because the reason for
 denying the service was solely related to the unavailability
 of stem-cell treatment. By contrast, in petitioners'
 HIV/AIDS example, the hospital's conduct would constitute
 discrimination because the reason for denying care was to
 avoid treating a protected class of people based on their
 protected status.
 
 48
 
          ¶97
 Here, declining to provide medical gender-affirming care for
 minors would have been discriminatory if the record reflected
 that the reason for this decision was to discriminate against
 transgender youth because of their protected status or
 associated conduct. But, it does not. CHC's decision had
 nothing to do with petitioners' protected status. Because
 the majority fails to apprehend this, it misapplies CADA.
 
 
          III.
 Conclusion
 
 
          ¶98
 I do not view petitioners as having adequately demonstrated a
 reasonable probability of success on the merits of their
 claim that CHC discriminated against them "because
 of" their gender identity, sex, or disability. They
 therefore have not met their burden under the first Rathke
 factor. Not only does the record make it clear that CHC did
 not intend to discriminate on any of the grounds raised, but
 it also shows that CHC's decision was made solely with
 the survival of the hospital-and, by extension, the
 well-being of its present and future patients, including
 petitioners themselves-in mind.
 
 
          ¶99
 Because petitioners were not entitled to a preliminary
 injunction, I respectfully dissent.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Gender-affirming care ranges from
 choice of pronouns to hormonal treatment and surgery.
 Petitioners and CHC agree that medical gender-affirming care
 is a subset of gender-affirming care that refers to medical
 procedures such as puberty blockers and hormone therapy used
 to treat gender dysphoria. Gender dysphoria "refers to
 the distress that may accompany the incongruence between
 one's experienced or expressed gender and one's
 assigned gender." Am. Psychiatric Ass'n,
 Diagnostic and Statistical Manual of Mental Disorders:
 DSM-5-TR 511 (5th ed. 2022).
 
 
 [2] "[G]ender diverse" is a
 nondiagnostic term that refers to "[physical] features
 or behaviors that are not typical (in a statistical sense) of
 individuals with the same assigned gender in a given society
 and historical era." Am. Psychiatric Ass'n, supra,
 at 511. "Transgender" refers to the broad spectrum
 of individuals whose gender identity is different from the
 gender they were assigned at birth. Id.
 
 
 [3] Medicaid is a joint federal-state
 program that provides health care coverage for low-income
 individuals and individuals with disabilities. See 42 U.S.C.
 § 1396d.
 
 
 [4] "Cisgender" describes
 individuals whose gender expression is consistent with the
 gender they were assigned at birth. Am. Psychiatric
 Ass'n, supra, at 511.
 
 
 [5] The parties did not explicitly address
 discrimination on the basis of sex at the preliminary
 injunction hearing, and the trial court order only briefly
 mentions disability discrimination in its analysis. Boe
 v. Child.'s Hosp. Colo., No. 26CV30232, at 18-19
 (Dist. Ct., City & Cnty. of Denver, Feb. 13, 2026)
 (unpublished order). Petitioners need only show a reasonable
 probability of success on the merits as to one of its CADA
 claims for a preliminary injunction to issue. Accordingly, we
 focus our analysis on their claim of discrimination on the
 basis of gender identity.
 
 
 [6] The issue set forth in the petition is
 as follows:
 
 
 1. When the lives of children are at stake, did the
 district court err by allowing the continued violation of the
 law and refusing to order Respondent to provide medically
 necessary gender-affirming care to prevent
 "certain" irreparable injury to Plaintiffs.
 
 
 [7] We granted the petition under C.A.R.
 21, which provides no mechanism for a cross-petition.
 Ordinarily, we confine ourselves to the issues presented in
 the petition. In this instance, we make a rare exception to
 our practice because of the unusual circumstances presented
 by this case.
 
 
 [8] Transgender youth comprise
 approximately 3.3% of the youth population in the United
 States. Jody L. Herman & Andrew R. Flores, How Many
 Adults and Youth Identify as Transgender in the United
 States? (Aug. 2025), https://
 williamsinstitute.law.ucla.edu/publications/trans-adults-united-states/
 [https://perma.cc/U5KP-X5WS]. So, transgender youth will
 always represent fewer individuals when compared to the
 population at large, and a purely numerical comparison will
 always leave them without protection when they are
 discriminated against based on gender identity.
 
 
 [9] With the trial court's permission,
 petitioners filed under pseudonyms. We use the same
 pseudonyms here. Consequently, we forgo our protocol of using
 initials for minors.
 
 
 [10] This is not to say that speculative
 harm can never outweigh actual harm to a plaintiff, but under
 the facts of this case, the balance tilts in favor of
 petitioners' actual harm.
 
 
 [11] CHC, for the first time on appeal,
 asserts that its policy is based on age, which isn't a
 protected class under CADA, and not on gender identity
 because it continues to provide medical gender-affirming care
 to transgender patients over the age of eighteen. Because
 this argument wasn't raised at the trial level, and
 because petitioners have demonstrated that a court could
 reasonably conclude the policy is based on gender identity,
 we will not address it.
 
 
 [1] As used here and by the parties,
 "medical gender-affirming care" refers to a subset
 of gender-affirming care that involves medical intervention,
 such as hormone replacement therapy or puberty
 blockers.
 
 
 [2] Given this conclusion, I would not
 reach any of the other issues addressed by the majority and
 therefore express no opinion on those issues.
 
 
 [3] The following facts are based on the
 trial court's findings of fact, following the preliminary
 injunction hearing.
 
 
 [4] Hospitals are expressly a place of
 public accommodation. § 24-34-600.3(1)(a)(VII), C.R.S.
 (2025).
 
 
 [5] As the trial court found,
 "Gender affirming care has an expansive definition. It
 ranges from the choice of pronouns and preferred name to
 hormonal treatment and surgery."
 
 
 [6] Importantly, "events [can] have
 multiple but-for causes, . . . [s]o long as the
 plaintiff's [protected class] was one but-for cause of
 [a] decision," this can suffice for purposes of showing
 discrimination. Bostock, 590 U.S. at 656 (citation
 omitted).
 
 
 [7] The court in Craig concluded
 that Masterpiece Cakeshop violated CADA "even
 if [it] assume[d] that CADA requires plaintiffs to
 establish an intent to discriminate, as in [a] section
 1985(3) action," because the "ALJ reasonably could
 have inferred" discriminatory intent from
 Masterpiece's conduct. ¶ 38, 370 P.3d at 282
 (emphasis added).
 
 
 [8] Petitioners go even further to argue
 that Craig establishes that intent is not even relevant. Yet,
 even if one disagrees that CADA requires proof of intent,
 intent certainly is still relevant to a but-for analysis. For
 instance, if petitioners had demonstrated that CHC intended
 to discriminate against transgender individuals here, they
 likely would have established that petitioners' gender
 identity was a but-for cause for CHC's decision to stop
 providing medical gender-affirming care to minors. This would
 have established that it actually was petitioners'
 protected status that caused the decision.
 
 
 ---------